**Tom CAMPBELL, et al., Plaintiffs,**

v.

**William Jefferson CLINTON, President of the United States, Defendant.**

**No. Civ.A. 99–1072 PLF.**

United States District Court, District of Columbia.

June 8, 1999.

---

Jules Lobel, Michael Ratner, Franklin Siegel, William Goodman, Jennifer Green, Center for Constitutional Rights, New York City, James Robert Klimaski, Klimaski & Smith, Washington, DC, H. Lee Halterman, Oakland, CA, Joel E. Starr, Washington, DC, for plaintiffs.

Andrea Gail Cohen, U.S. Dept. Of Justice, Federal Programs Branch, Washington, DC, for defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

Since March 24, 1999, the United States has been participating in an air offensive launched by the North Atlantic Treaty Organization against the Federal Republic of Yugoslavia. Plaintiffs, twenty-six members of the United States House of Representatives, seek a declaration that the President has violated the War Powers Clause of the Constitution and the War Powers Resolution, 50 U.S.C. § 1541, *et seq.*, by involving the United States in the air offensive without congressional authorization. The defendant is the President of the United States, who has filed a motion to dismiss this action. Upon full consideration of the defendant's motion, plaintiffs' opposition, the defendant's reply and the arguments presented by counsel at the hearing held on June 3, 1999, and for the reasons stated below, the Court concludes that plaintiffs do not have standing to raise these claims. The motion to dismiss therefore will be granted.

## I. BACKGROUND

### A. Constitutional and Statutory Framework

The War Powers Clause of the United States Constitution provides Congress with the power to "declare War...." U.S. Constitution, Art. I, § 8, cl. 11. Congress' power to declare war works in conjunction with the authority granted to the President under the Constitution to act as "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Constitution, Art. II, § 2, cl. 1. The Constitution does not further delineate the precise scope of the powers granted to the executive and legislative branches, but clearly the Framers intended to

give each of the two branches a role in the conduct of foreign affairs. Essentially, Congress would declare war and raise and financially maintain armies, while the President would conduct wars.

In 1973, over President Richard Nixon's veto, Congress passed the War Powers Resolution, 50 U.S.C. § 1541, *et. seq.*, in order to "fulfill the intent of the framers of the Constitution of the United States and insure that the collective judgment of both the Congress and the President will apply to the introduction of United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, and to the continued use of such forces in hostilities or in such situations." 50 U.S.C. § 1541(a). The purpose of the resolution was to ensure that the "constitutional powers of the President as Commander–in–Chief to introduce United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, are exercised only pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) a national emergency created by attack upon the United States, its territories or possessions, or its armed forces." 50 U.S.C. § 1541(c).

The War Powers Resolution provides, *inter alia,* that "[i]n the absence of a declaration of war, in any case in which United States Armed Forces are introduced (1) into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances; (2) into the territory, airspace or waters of a foreign nation while equipped for combat, except for deployments which relate solely to supply, replacement, repair, or training of such forces; or (3) in numbers which substantially enlarge United States Armed Forces equipped for combat already located in a foreign nation; the President shall submit within 48 hours" to the Speaker of the House of Representatives and to the President *pro tempore* of the Senate a written report setting forth the circum-

stances necessitating the introduction of forces, the constitutional and legislative authority to introduce the forces and the estimated scope and duration of the hostilities or involvement. 50 U.S.C. § 1543(a). The President also is required to submit periodic reports, at least every six months, for as long as the forces remain engaged in hostilities. 50 U.S.C. § 1543(c).

Within sixty calendar days after the President either submits a report pursuant to Section 1543(a) or is required to have submitted a report, the President must terminate the use of the United States Armed Forces described in Section 1543 unless Congress (1) has declared war or has provided specific authorization for the use of such forces, (2) has extended by law the sixty-day time period, or (3) is physically unable to meet as a result of an armed attack on the United States. 50 U.S.C. § 1544(b). The President may extend the sixty day period an additional thirty days if he determines and certifies in writing to the Congress that the continued use of forces for the additional time is necessary to safely remove the United States Armed Forces. *Id.* The War Powers Resolution also sets forth a mechanism so that both houses of Congress are required to give priority consideration to any resolution or bill that would provide the President with the authorization described above. *See* 50 U.S.C. §§ 1545, 1546, 1546a.

Finally, the War Powers Resolution explicitly provides that authority to introduce forces into hostilities shall not be inferred "from any provision of law ... including any provision contained in any appropriations Act, unless such provision specifically authorizes the introduction of United States Armed Forces into hostilities or into such situations *and* states that it is intended to constitute specific statutory authorization within the meaning of [the War Powers Resolution]," or "from any treaty ... unless such treaty is implemented by legislation specifically authorizing the introduction of United States

Armed Forces into hostilities or into such situations *and* stating that it is intended to constitute specific statutory authorization within the meaning of [the War Powers Resolution]." 50 U.S.C. § 1547(a) (emphasis added).

## B. Conflict with Federal Republic of Yugoslavia

Kosovo, a region of Serbia, historically has been inhabited both by ethnic Albanians and by ethnic Serbs. *See* Def's Motion to Hold in Abeyance, Att. A (Declaration of Under Secretary of State for Political Affairs Thomas R. Pickering) at ¶ 3. The region gained a considerable degree of autonomy through the 1970's, and by the late 1980's ethnic Albanians constituted an "overwhelming majority of the population in Kosovo." *Id.* at ¶ 4. When Slobodan Milosevic came to power in Serbia in the late 1980's, he abolished the autonomous status of the province, and Kosovo's ethnic Albanians began taking various non-violent measures to resist Milosevic and the authoritarian rule of Serbia. *Id.* at ¶ 5. In early 1998, Serbia launched a crackdown in Kosovo, killing dozens of ethnic Albanians and causing thousands to flee the Kosovo region. *Id.* at ¶ 8.

Throughout 1998 and into the beginning of 1999, the United States in partnership with NATO member countries and other allies sought a diplomatic resolution to the conflict between the ethnic Albanians in Kosovo and Milosevic's government, and it imposed various economic sanctions against the Federal Republic of Yugoslavia in an effort to force a resolution. *See* Pickering Declaration at ¶¶ 11–14. After the massacre of forty-five ethnic Albanian civilians in January 1999, diplomatic efforts intensified, and the Kosovo Albanians and representatives of the Serbian government participated in peace negotiations in Rambouillet, France in February 1999. *Id.* at ¶¶ 14, 15. On March 15, 1999, the Kosovo Albanian delegation signed the interim agreement that had been proposed in Rambouillet, but three days later negotiations were suspended because the Serbian delegation refused to accept the interim agreement. *Id.* at ¶ 17. By March 19, 1999, the tempo of the repressive offensive by Milosevic's armed units had intensified. *Id.* at ¶ 18. Milosevic's forces drove thousands of ethnic Albanians from their homes and villages, summarily executed some, displaced others and burned many of their villages. *Id.*

On March 21, 1999, Ambassador Richard Holbrooke made a final diplomatic effort to persuade the Milosevic government to accept the interim agreement, but he failed in that mission and departed Belgrade on March 23, 1999, without having achieved any progress towards a diplomatic resolution. Pickering Declaration at ¶ 19. That day, March 23, 1999, the Senate passed by a vote of 58 to 41 a concurrent resolution authorizing the President to "conduct military air operations and missile strikes in cooperation with our NATO allies against the Federal Republic of Yugoslavia (Serbia and Montenegro)." S.Con.Res. 21, 106th Cong. (1999).

The next day, March 24, 1999, United States Armed Forces in coalition with NATO allies began a series of air strikes in the Federal Republic of Yugoslavia. *See* Amended Complaint at ¶ 8; Pickering Declaration at ¶ 19. That same day, by a vote of 424 to 1, the House of Representatives passed a resolution stating that it "supports the members of the United States Armed Forces who are engaged in military operations against the Federal Republic of Yugoslavia and recognizes their professionalism, dedication, patriotism, and courage." H.R.Res. 130, 106th Cong. (1999).

Two days later, President Clinton sent identical letters to J. Dennis Hastert, Speaker of the House of Representatives, and to Strom Thurmond, President *pro tempore* of the Senate. The letter opens: "At approximately 1:30 p.m. eastern standard time, on March 24, 1999, U.S. military forces, at my direction and in coalition

with our NATO allies, began a series of air strikes in the Federal Republic of Yugoslavia (FRY) in response to the FRY government's continued campaign of violence and repression against the ethnic Albanian population in Kosovo." *See* Pls' Motion for Summ.J., Exh. 19.[1] The letter goes on to detail the circumstances that led to the decision to begin air strikes in the Federal Republic of Yugoslavia, including the atrocities committed by the Milosevic government and the Milosevic government's history of noncompliance with resolutions of the United Nations Security Council and NATO. The letter concludes: "We cannot predict with certainty how long these operations will need to continue.... Milosevic must stop his offensive, stop the repression and agree to a peace accord based on the framework from Rambouillet.... I have taken these actions pursuant to my constitutional authority to conduct foreign relations and as Commander in Chief and Chief Executive. In doing so, I have taken into account the views and support expressed by the Congress.... I am providing this Report as part of my efforts to keep the Congress fully informed, consistent with the War Powers Resolution. I appreciate the support of the Congress in this action." *Id.*

On April 7, 1999, the President again sent letters to Speaker Hastert and Senator Thurmond reporting on the situation in Kosovo as part of his "efforts to keep the Congress fully informed, consistent with the War Powers Resolution." *See* Pls' Motion for Summ.J., Exh. 38. The letter states that "[w]e will continue to intensify our actions to achieve the objectives I set forth in my report to the Congress of March 26 and to support the international relief efforts being conducted in the region." The letter reemphasizes that it is "not possible to predict how long [the] operations will continue." *Id.*

On April 28, 1999, the House of Representatives voted on four measures relevant to this action. By a vote of 2 to 427, the House defeated a joint resolution declaring a state of war between the United States and the government of the Federal Republic of Yugoslavia. *See* H.R.J.Res. 44, 106th Cong. (1999). By a tie vote, 213 to 213, the House rejected the concurrent resolution that had been passed by the Senate on March 23, 1999, authorizing the President to conduct military air operations and missile strikes against the Federal Republic of Yugoslavia. *See* S.Con.Res. 21, 106th Cong. (1999). The House also defeated by a vote of 139 to 290 a concurrent resolution that would have directed the President, "pursuant to section 5(c) of the War Powers Resolution, [50 U.S.C. § 1544(c),] to remove United States Armed Forces from their positions in connection with the present operations against the Federal Republic of Yugoslavia." *See* H.R.Con.Res. 82, 106th Cong. (1999). Finally, the House passed a bill that prohibits the use of Department of Defense funds for deployment of United States ground forces to the Federal Republic of Yugoslavia without specific congressional authorization. *See* H.R. 1569, 106th Cong. (1999).[2]

On May 20, 1999, Congress passed an Emergency Supplemental Appropriations Act that, *inter alia*, provides supplemental emergency appropriations for the conflict in Yugoslavia. The appropriations bill requires the President to transmit to the Congress "a report, in both classified and unclassified form, on current United States participation in Operation Allied Force," defined as "operations of the North Atlantic Treaty Organization (NATO) conducted against the Federal Republic of Yugoslavia (Serbia and Montenegro) during the period beginning on March 24, 1999, and ending on such date as NATO may designate, to resolve the conflict with respect to Kosovo." *See* 1999 Emergency Supplemental Appropriations Act, Pub.L. No. 106–31,

---

**1.** Plaintiffs incorporated exhibits from their motion for summary judgment into their opposition to the President's motion to dismiss.

**2.** The Senate has taken no action on that bill.

113 Stat. 57. The Appropriations Act does not contain a statement that it is intended to constitute specific statutory authorization within the meaning of the War Powers Resolution.

### C. Background of This Lawsuit

Plaintiffs are twenty-six members of the House of Representatives who voted nay on the Senate's concurrent resolution that would have authorized the President to conduct military air operations and missile strikes against the Federal Republic of Yugoslavia.[3] Plaintiffs have sued President William Jefferson Clinton, contending that he has violated the War Powers Clause of the Constitution by beginning the air strikes prior to a congressional declaration of war and by continuing the air strikes without any congressional declaration of war or authorization under the Constitution.

Plaintiffs also claim that the President has violated the War Powers Resolution. They maintain that on March 26, 1999, two days after the air strikes began, the President was required to submit a written report pursuant to Section 1543(a) of the War Powers Resolution to the Speaker of the House of Representatives and to the President *pro tempore* of the Senate.[4] Regardless of whether such report was submitted, plaintiffs contend that pursuant to Section 1544, the President was required to withdraw the United States Armed Forces from the Federal Republic of Yugoslavia by May 25, 1999, sixty days after the date he either did submit or was obligated to submit the written report required by the War Powers Resolution. Plaintiffs allege that the President was compelled to withdraw troops because Congress has not declared war on the Federal Republic of Yugoslavia, has not specifically authorized the use of forces,

and has not specifically extended the sixty day period. Rather, the measure declaring war on the Federal Republic of Yugoslavia was overwhelmingly defeated in the House of Representatives, and the concurrent resolution that would have authorized the President to conduct military air operations and missile strikes in cooperation with NATO allies against Yugoslavia was very narrowly defeated in the House of Representatives. The appropriations bill lacked any specific authorization pursuant to the War Powers Resolution for the President to continue the air strikes, and Congress has not considered any extensions of time pursuant to the War Powers Resolution.

Plaintiffs therefore argue that either the President must immediately withdraw the troops from the Federal Republic of Yugoslavia or, if he determines and certifies in writing to the Congress that the continued use of forces for additional time is necessary solely in order to safely remove United States Armed Forces, he must withdraw the troops within thirty days. Plaintiffs seek a declaration to that effect from this Court.

The President has filed a motion to dismiss arguing that plaintiffs lack standing, that this case presents a non-justiciable political question, and that the issues presented are not ripe for resolution by the Court at this time. Plaintiffs have filed a motion for summary judgment. The Court has held in abeyance further briefing on plaintiffs' motion pending a determination on the motion to dismiss filed by the President. *See* Order of May 26, 1999. The Court heard argument on the President's motion to dismiss on June 3, 1999.

## II. DISCUSSION

Plaintiffs, who are members of the legislative branch, seek a declaration from the

---

**3.** On June 7, 1999, plaintiffs filed an Amendment to the Complaint to add five additional plaintiffs. The addition of these plaintiffs does not change the Court's analysis.

**4.** The Court does not understand whether or why plaintiffs believe the President did not

comply with Section 1543(a) by virtue of the letters he sent to Speaker Hastert and Senator Thurmond on March 26, 1999. *See supra* at 37–38.

judicial branch that the President, the head of the executive branch, has violated the War Powers Clause of the Constitution and the War Powers Resolution by conducting air strikes in the Federal Republic of Yugoslavia without congressional authorization. Any case involving coordinate and co-equal branches of government raises separation of powers concerns, *see, e.g., Moore v. United States House of Representatives*, 733 F.2d 946, 955–56 (D.C.Cir. 1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); *Riegle v. Fed'l Open Market Comm.*, 656 F.2d 873, 879 (D.C.Cir.1981), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981), and War Powers actions brought by legislators raise especially grave separation of powers issues. *See Dellums v. Bush*, 752 F.Supp. 1141, 1149 (D.D.C.1990) ("The principle that the courts shall be prudent in the exercise of their authority is never more compelling than when they are called upon to adjudicate on such sensitive issues as those trenching upon military and foreign affairs").

For this reason, judges traditionally have expressed great reluctance to intercede in disputes between the political branches of government that involve matters of war and peace. Some judges have found a jurisdictional bar: legislators lack standing to sue in such cases. *See, e.g., Crockett v. Reagan*, 720 F.2d 1355, 1357 (D.C.Cir.1983) (Bork, J., concurring), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Holtzman v. Schlesinger*, 484 F.2d 1307, 1309–10 (2d Cir.1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *cf. Goldwater v. Carter*, 617 F.2d 697, 709–15 (D.C.Cir.) (en banc) (Wright and Tamm, J.J., concurring in result), *vacated and remanded with directions to dismiss*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). Others, while

finding standing, have concluded that the particular dispute is not yet ripe for adjudication. *See Dellums v. Bush*, 752 F.Supp. at 1151. Because the law that developed in this Circuit over the years did not impose a particularly high standard to demonstrate legislative standing, judges here have sometimes exercised so-called equitable or remedial discretion to decline to resolve such cases or have invoked the political question or non-justiciability doctrine to avoid the political thicket. *See, e.g., Mitchell v. Laird*, 488 F.2d 611, 615–16 (D.C.Cir.1973) (political question); *Lowry v. Reagan*, 676 F.Supp. 333, 339–40 (D.D.C.1987) (political question and remedial discretion); *Crockett v. Reagan*, 558 F.Supp. 893, 898–99 (D.D.C.1982) (political question and equitable discretion), *aff'd per curiam*, 720 F.2d 1355 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

The legal landscape with respect to legislative standing was altered dramatically by the Supreme Court in its first Line Item Veto decision, *Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Virtually all of this Circuit's prior jurisprudence on legislative standing now may be ignored, and the separation of powers considerations previously evaluated under the rubric of ripeness or equitable or remedial discretion now are subsumed in the standing analysis. For all intents and purposes, the strict legislative standing analysis suggested by Justice Scalia in *Moore v. United States House of Representatives*, 733 F.2d at 956–61 (Scalia, J., concurring), now more closely reflects the state of the law. *See also Crockett v. Reagan*, 720 F.2d at 1357 (Bork, J., concurring). The Court's analysis in this case therefore begins and ends with the question of standing.[5]

---

**5.** In addition to standing and ripeness, the President also has argued that this case raises a non-justiciable political question. To the extent that the President is arguing that *every* case brought by a legislator alleging a violation of the War Powers Clause raises a non-

justiciable political question, he is wrong. *See Baker v. Carr*, 369 U.S. 186, 210–11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.... [The Court instead

■ Article III of the Constitution limits the jurisdiction of the federal courts to deciding actual cases and controversies. "[T]he doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), and it "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). At an irreducible minimum, in order to establish standing plaintiffs seeking to obtain relief must allege " 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *See Raines v. Byrd,* 521 U.S. at 818, 117 S.Ct. 2312 (*quoting Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. 3315).

■ The dispute over standing in this case centers on whether plaintiffs, suing in their capacities as members of the House of Representatives, have alleged a particularized and personal injury sufficient to establish their interest in this litigation.[6] The alleged injury must be "legally and judicially cognizable," which means, among other things, "that the plaintiff have suffered an invasion of a legally protected interest which is concrete and particularized, and that the dispute is traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd,* 521 U.S. at 819, 117 S.Ct. 2312 (internal quotations and citations omitted). "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright,* 468 U.S. at 754, 104 S.Ct. 3315.

Since the standing requirement is based on separation of powers principles, the standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *See Raines v. Byrd,* 521 U.S. at 819–20, 117 S.Ct. 2312. Alleging a sufficiently concrete and particularized injury to establish institutional standing as a member of Congress is not an easy task. especially since "the only test of congressional standing that is both consistent with our constitutional traditions and susceptible of principled application ... must take as its point of departure the principle that we sit here neither to supervise the internal workings of the executive and legislative branches nor to umpire disputes between those branches regarding their respective powers." *Moore v. United States House of Representatives,* 733 F.2d at 959 (Scalia, J., concurring).

In *Raines v. Byrd,* the Supreme Court held that members of Congress who voted against the Line Item Veto Act, 2 U.S.C. § 691, *et. seq.,* lacked standing to challenge the constitutionality of that Act. *See Raines v. Byrd,* 521 U.S. at 829–30, 117 S.Ct. 2312. Plaintiffs in *Raines* had alleged that they suffered injury in their institutional capacity because the Act diminished the effectiveness of their future votes on appropriations bills and altered the balance of power between Congress and the President. The Court concluded, however, that any such injury was "wholly abstract and widely dispersed" and that plaintiffs therefore had failed to allege a

---

must conduct] a discriminating analysis of the particular question posed" in order to determine whether the issue is justiciable); *Mitchell v. Laird,* 488 F.2d at 614 (in some instances there may be "judicial competence to determine the allocation, between the executive and legislative branches, of the powers to wage war"). Because the Court concludes that plaintiffs lack standing, however, it need not reach the issue of whether this case is one in which the judicial branch has competence to adjudicate such questions.

**6.** It is clear that plaintiffs are suing in their official capacities as members of Congress and not in their individual capacities. *Compare* Amended Complaint at ¶ 4 *with Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

"sufficiently concrete injury to have established Article III standing." *See id.*

At oral argument, plaintiffs' counsel acknowledged that after *Raines*, a general allegation that the President has ignored the War Powers Clause or the War Powers Resolution is too generalized an injury to provide a legislator with standing. Citing *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), the one case in which the Supreme Court has upheld standing for legislators claiming an institutional injury, plaintiffs instead argue that where Congress has affirmatively exercised its authority and the President "nullifies" or ignores a clear direction from Congress, legislators do have standing to challenge the President's actions.

In *Coleman*, members of the Kansas State Senate established standing in their institutional capacities to seek redress for an alleged nullification of a vote they had taken. Twenty members of the forty-member Kansas State Senate voted against an amendment to the United States Constitution. Lacking a majority vote, the amendment would not have been ratified except that the Lieutenant Governor, the President of the State Senate, cast the deciding vote for the amendment. Plaintiffs, including all twenty senators who had voted against the amendment, alleged that the Lieutenant Governor had no authority to cast the deciding vote and sued for a writ of mandamus in the Kansas Supreme Court to prevent the governor from certifying that the amendment had been ratified. The Kansas Supreme Court found that plaintiffs had standing but ruled against them on the merits. On certiorari, the Supreme Court held that the members of the legislature had standing because the votes of the plaintiffs "against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification." *See Coleman v. Miller*, 307 U.S. at 438, 59 S.Ct. 972.

While the *Coleman* decision was not overturned by *Raines*, it has been limited and now stands at most "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the grounds that their votes have been completely nullified." *See Raines v. Byrd*, 521 U.S. at 823, 117 S.Ct. 2312.[7] It was unnecessary for the Court in *Raines* to examine the precise parameters of the *Coleman* exception, however, because of the "vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power" that was alleged by the members of Congress challenging the Line Item Veto Act. *See Raines v. Byrd*, 521 U.S. at 824, 117 S.Ct. 2312.

The circumstances of this case obviously are more similar to those of *Coleman* than were the circumstances in *Raines*. Plaintiffs here allege that the President's actions have deprived them of "their constitutional right and duty under Article I, Section 8, Clause 11, to commit this country to war, or to prevent, by refusing their assent, the committing of this country to war," and that the President has "completely nullifie[d] their vote against authorizing military air operation and missile strikes against Yugoslavia." Amended Complaint at ¶ 18. They have alleged that they voted against the concurrent resolution authorizing the President to conduct air strikes in the Federal Republic of Yugoslavia, that they had sufficient votes to defeat that resolution and that the resolu-

---

7. It is important to note that *Coleman* did not implicate separation of powers concerns to the extent that they are implicated in this case because the plaintiffs there were *state* legislators challenging the acts of a *state* executive. *See Raines v. Byrd*, 521 U.S. at 824 n. 8, 832 n. 3, 117 S.Ct. 2312 (Souter, J., concurring). It is possible that the *Coleman* exception is further narrowed where, as here, plaintiffs are members of the *federal* legislature who are challenging the actions of the *federal* executive.

tion in fact failed. *See id.* at ¶¶ 15, 17. They also have alleged that they had sufficient votes to defeat a measure declaring a state of war against the Federal Republic of Yugoslavia. *Id.* at ¶¶ 16, 17. Despite the fact that both of those measures were defeated, plaintiffs allege that the President of the United States has ignored the votes and has acted as though Congress either has declared war or has specifically authorized his actions in the Federal Republic of Yugoslavia.

While there are facial similarities between the facts of *Coleman* and the situation presented in this case, upon closer scrutiny of plaintiffs' allegations, the Court concludes that plaintiffs lack standing under the *Coleman* exception to *Raines*. In the circumstances presented, the injury of which plaintiffs complain—the alleged "nullification" of congressional votes defeating the measures declaring war and providing the President with authorization to conduct air strikes—is not sufficiently concrete and particularized to establish standing. To have standing, legislative plaintiffs must allege that their votes have been "completely nullified," *Raines v. Byrd*, 521 U.S. at 823, 117 S.Ct. 2312, or "virtually held for naught." *Coleman v. Miller*, 307 U.S. at 438, 59 S.Ct. 972. Such a showing requires them to demonstrate that there is a true "constitutional impasse" or "actual confrontation" between the legislative and executive branches; otherwise courts would "encourage small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process

has the opportunity to resolve the conflict." *Goldwater v. Carter*, 444 U.S. at 997–98, 100 S.Ct. 533 (Powell, J., concurring). In the Court's view, there is no such constitutional impasse here.[8]

If Congress had directed the President to remove forces from their positions and he had refused to do so or if Congress had refused to appropriate or authorize the use of funds for the air strikes in Yugoslavia and the President had decided to spend that money (or money earmarked for other purposes) anyway, that likely would have constituted an actual confrontation sufficient to confer standing on legislative plaintiffs. *Cf. Goldwater v. Carter*, 444 U.S. at 999–1000, 100 S.Ct. 533 (Powell, J., concurring) (in hypothetical situation where President announces that treaty would go into effect despite its rejection by Senate, judicial branch could resolve dispute). The two votes at issue in this case, however, do not provide the President with such an unambiguous directive; neither vote facially required the President to do anything or prohibited him from doing anything. Unlike in *Coleman* where the meaning of the vote allegedly nullified was clearly that the legislature did not want the amendment ratified, the meaning of the two votes at issue in this case is not self-evident. The fact that some members of Congress believe that the President's actions are inconsistent with two particular congressional votes does not *a fortiori* demonstrate an impasse that would provide those members of Congress with standing.

---

8. A finding that the legislative plaintiffs in this case lack standing under these circumstances does not preclude judicial resolution of a challenge to the President's actions. Counsel for the President appears to have acknowledged that an *individual* alleging personal injury from the President's alleged failure to comply with the War Powers Clause or the War Powers Resolution, as for instance a serviceperson who has been sent to carry our the air strikes against the Federal Republic of Yugoslavia, would have standing to raise these claims. *See* Def's Reply at 8. *Compare Raines v. Byrd*, 521 U.S. at 830, 117 S.Ct.

2312 (members of Congress alleging institutional injury have no standing to challenge constitutionality of Line Item Veto Act) *with Clinton v. New York*, 524 U.S. 417, 118 S.Ct. 2091, 2099, 141 L.Ed.2d 393 (1998) (individuals alleging personal injury from President's exercise of power granted by Line Item Veto Act do have standing to challenge constitutionality of Act). The Court also notes that the political question doctrine does not apply to suits brought by individuals in their personal capacities. *See Michel v. Anderson*, 14 F.3d 623, 628 (D.C.Cir.1994).

Congressional reaction to the air strikes has sent distinctly mixed messages, and that congressional equivocation undermines plaintiffs' argument that there is a direct conflict between the branches. On the same day that the House of Representatives defeated the measures declaring war against the Federal Republic of Yugoslavia and providing the President with authorization to conduct air strikes, it also defeated a resolution that would have directed the President, "pursuant to section 5(c) of the War Powers Resolution, to remove United States Armed Forces from their positions in connection with the present operations against the Federal Republic of Yugoslavia." H.R.Con.Res. 82, 106th Cong. (1999). Congress subsequently passed a Supplemental Emergency Appropriations Act that provides funding for the activities being undertaken in the Federal Republic of Yugoslavia. *See* 1999 Emergency Supplemental Appropriations Act, Pub.L. No. 106–31, 113 Stat. 57.[9] Had the four votes been consistent and against the President's position, and had he nevertheless persisted with air strikes in the face of such votes, there may well have been a constitutional impasse. But Congress has not sent such a clear, consistent message. Where, as here, Congress has taken actions that send conflicting signals with respect to the effect and significance of the allegedly nullified votes, there is no actual confrontation or impasse between the executive and legislative branches and thus no legislative standing. *Cf. Goldwater v. Carter,* 444 U.S. at 997–98, 100 S.Ct. 533 (Powell, J., concurring); *Lowry v. Reagan,* 676 F.Supp. at 340–41; *Moore v. United States House of Representatives,* 733 F.2d at 954–56; *Holtzman v. Schlesinger,* 484 F.2d at 1315.[10]

Finally, it is significant that some of the 213 representatives who voted against authorizing the President's actions and against a declaration of war also voted in favor of supporting the troops and appropriating money to fund the conflict in Yugoslavia and against directing the President to remove the Armed Forces from their positions. The position of the twenty-six plaintiffs—that the President has nullified congressional votes by continuing air strikes—therefore appears not to be shared by a number of their colleagues the nullification of whose votes they seek to vindicate. While the Court is not suggesting that all 213 representatives who voted to defeat the authorization resolution must join in this lawsuit in order to establish legislative standing, the absence of any indication that the twenty-six plaintiffs have been authorized to represent those two-hundred and thirteen representatives—or even a substantial number of them—compels the conclusion that plaintiffs have no standing to raise these claims. *See Raines v. Byrd,* 521 U.S. at 829, 117 S.Ct. 2312 ("We attach some importance to the fact that [plaintiffs] have not been authorized to represent their respective Houses of Congress in this action ..."); *Bender v. Williamsport Area School District,* 475 U.S. 534, 544, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (status as school board member did not confer upon plaintiff right to appeal on behalf of board as a whole where board itself declined to take such appeal); *Dellums v. Bush,* 752 F.Supp. at 1151 ("it is only if the majority of the Congress seeks relief from an infringement on its constitutional war-declaration

---

9. While neither the defeat of the House concurrent resolution nor the passage of the Appropriations Act constitutes an "authorization" within the meaning of the War Powers Resolution, *see* 50 U.S.C. § 1547, congressional action on those measures is relevant to the legislative standing analysis.

10. Because plaintiffs' alleged injury is caused in part by their failure to persuade their col-

leagues in the Congress to defeat the budget authorization bill and to vote for the resolution directing the President to withdraw troops from Yugoslavia, it also is not clear that plaintiffs can establish that their alleged injury is "fairly traceable" to the actions of the President rather than to the actions of their colleagues in the Congress. *See Raines v. Byrd,* 521 U.S. at 830 n. 11, 117 S.Ct. 2312.

power that it may be entitled to receive it").[11]

For all of these reasons, plaintiffs have failed to establish a sufficiently genuine impasse between the legislative and executive branches to give them standing. The most that can be said is that Congress is divided about its position on the President's actions in the Federal Republic of Yugoslavia and that the President has continued with air strikes in the face of that divide. Absent a clear impasse between the executive and legislative branches, resort to the judicial branch is inappropriate. *See Goldwater v. Carter,* 444 U.S. at 997, 100 S.Ct. 533 (Powell, J., concurring) ("The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse" "); *Dellums v. Bush,* 752 F.Supp. at 1149 ("Judicial restraint must, of course, be even further enhanced where the issue is one—as here—on which the other two branches [themselves] may be deeply divided"). *Cf. Humphrey v. Baker,* 848 F.2d 211, 214 (D.C.Cir.1988) ("the availability of an internally available remedy to Members of Congress means that it would be an abuse of discretion for the judiciary to entertain the action"), *cert. denied sub nom. Humphrey v. Brady,* 488 U.S. 966, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988). Because plaintiffs have failed to demonstrate an actual confrontation or constitutional impasse between the legislative and executive branches, they have no standing to bring this action.

This is not to say that members of the legislative branch never have standing to resort to the judicial branch when the executive branch flouts the law. But the courts will apply *Raines* and *Coleman* rigorously and will find standing only in the clearest cases of vote nullification and genuine impasse between the political branches. Under the circumstances presented in this case, the Court cannot conclude that plaintiffs have standing to bring this action, and the case therefore will be dismissed. An Order and Judgment consistent with this Opinion will be issued this same day.

SO ORDERED.

11. The President has suggested that if Congress has available to it other remedies to check a President's alleged abuse of power such as impeaching him or withholding funds, a judicial remedy is precluded. That is incorrect. The mere *availability* of a legislative alternative is not sufficient to defeat standing; if it were, a legislator would never have standing since Congress always has the option of impeaching and removing the President.

While the *availability* of such a remedy does not affect the standing analysis, the fact that Congress *actually took* contradictory steps certainly *is* relevant to a determination of standing under *Raines* and *Coleman*. If neither the budget authorization bill nor the measure directing the President to withdraw troops from Yugoslavia had been introduced or considered, the fact that Congress *could have* introduced such bills may not have been sufficient to defeat standing. But the House of Representatives did in fact consider and vote on both measures, and the congressional action on those two measures therefore cannot be ignored.