# Authorization for Continuing Hostilities in Kosovo

Pub L. No. 106–31, the emergency supplemental appropriation for military operations in Kosovo, constituted authorization for continuing hostilities after the expiration of sixty days under section 5(b) of the War Powers Resolution.

December 19, 2000

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum memorializes and explains advice we provided to you in May of 1999 regarding whether Pub. L. No. 106–31, 113 Stat. 57 (May 21, 1999), the emergency supplemental appropriation for military operations in Kosovo, constituted authorization for continuing hostilities after the expiration of sixty days under section 5(b) of the War Powers Resolution, Pub. L. No. 93–148, 87 Stat. 555 (1973) (codified at 50 U.S.C. §§ 1541–1548 (1994)) (the "WPR"). This Office advised that the appropriation did constitute such authorization. Subsequently, the district court for the District of Columbia and the Court of Appeals for the D.C. Circuit decided a lawsuit brought against the President by thirty-one members of Congress, who claimed that the President had violated the Constitution and the WPR by involving the United States in hostilities in Kosovo without congressional authorization. Neither the district court nor the court of appeals reached the merits of the plaintiffs' claims. The district court dismissed the suit for lack of standing, *Campbell v. Clinton*, 52 F. Supp. 2d 34 (D.D.C. 1999), and the D.C. Circuit affirmed the dismissal, also on standing grounds, 203 F.3d 19 (D.C. Cir.), *cert. denied*, 531 U.S. 815 (2000).

Section I of this memorandum summarizes the relevant provisions of the WPR, including section 8(a)(1), which provides that authorization may not be inferred from appropriation laws that do not specifically refer back to the WPR. Section II shows that the relevant case law, historical practice, and basic principles of constitutional law lead to the conclusion that appropriation laws may authorize military combat. Section III shows that section 8(a)(1) does not bar later Congresses from authorizing military operations through appropriations (an interpretation that would be unconstitutional), but instead has the effect of creating a background principle that may inform the interpretation of later Acts of Congress. Section IV shows that by enacting Pub. L. No. 106–31, Congress intended to enable the President to continue U.S. participation in Operation Allied Force. Finally, Section V presents this Office's conclusion that, even taking account of the background principle established by section 8(a)(1), Pub. L. No. 106–31 authorized the President to continue military operations in Kosovo.[1]

---

[1] Previous Administrations have expressed different views concerning the constitutionality of the WPR. *Compare* President Nixon's Veto of the War Powers Resolution, H.R. Doc. No 93–171, at 1 (1973) (calling "unconstitutional"

Continued

## I. The War Powers Resolution and Authorization of Hostilities

The WPR is framework legislation that sets forth procedures for reporting and authorizing hostilities. The statute begins with a congressional declaration of purpose:

> It is the purpose of this chapter to fulfill the intent of the framers of the Constitution of the United States and insure that the collective judgment of both the Congress and the President will apply to the introduction of United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, and to the continued use of such forces in hostilities or in such situations.

50 U.S.C. § 1541(a).[2] This section summarizes the most important provisions of the statute.

The "core" of the WPR "resides in sections 4(a)(1) and 5(b)." John Hart Ely, *War and Responsibility* 48 (1993).[3] Section 4(a)(1) of the WPR requires the President to submit a report to Congress whenever, "[i]n the absence of a declaration of war," United States Armed Forces are introduced "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances." 50 U.S.C. § 1543(a)(1). Section 5(b) requires the President to "terminate any use of the United States Armed Forces with respect to which [a] report [under section 4(a)(1)] was submitted (or required) [within 60 days thereafter]" unless the Congress takes certain enumerated actions to authorize continuing combat or "is physically unable to meet as a result of an armed attack upon the United States." 50 U.S.C. § 1544(b). The 60 day period may be extended

---

the provision in the WPR that "would automatically cut off certain authorities after sixty days unless the Congress extended them"), *with* "Ask President Carter". Remarks During a Telephone Call — in Program on the CBS Radio Network," 1 Pub Papers of Jimmy Carter 324 (Mar 5, 1977) (noting that WPR is an "appropriate reduction" in the President's power), *Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 196 (1980) ("We believe that Congress may, as a general constitutional matter, place a 60-day limit on the use of our armed forces as required by the provisions of § 1544(b) of the Resolution "). In light of our conclusion that Congress lawfully authorized continued hostilities beyond the 60-day statutory limit, we have no occasion to consider any constitutional arguments that might be made.

[2] The WPR had its origins in the Vietnam War. *See* 119 Cong. Rec. 1394 (1973) (statement of Senator Javits) ("[WPR was] an effort to learn from the lessons of the last tragic decade of war in Vietnam which has cost our Nation so heavily in blood, treasure, and morale. The War Powers Act would assure that any future decision to commit the United States to any warmaking must be shared in by the Congress to be lawful "); *see also* Thomas F. Eagleton, *War and Presidential Power* 107–123 (1974) (discussing background of WPR in Vietnam War). For discussion of initial attempts to enact war powers legislation, *see* Thomas F. Eagleton, *Congress and the War Powers*, 37 Mo. L. Rev 1, 18–20 (1972); William B. Spong. Jr., *Can Balance Be Restored in the Constitutional War Powers of the President and Congress?*, 6 U Rich L Rev 1, 18–28 (1971). Senator Eagleton introduced a war powers bill into the Senate in 1971 and played a prominent role in the Senate debates over war powers legislation. Senator Spong, in conjunction with Senators Javits and Eagleton, managed the Senate War Powers legislation for the Foreign Relations Committee *See* Eagleton, *supra*, at 134

[3] We have outlined the general structure of the War Powers Resolution in *Overview of the War Powers Resolution*, 8 Op. O L.C. 271 (1984).

for an additional 30 days if the President certifies to Congress that "unavoidable military necessity respecting the safety of United States Armed Forces requires the continued use of such armed forces in bringing about a prompt removal of such forces." *Id.* Thus, when a report under section 4(a)(1) is filed (or required to be filed), section 5(b)'s 60 day (or, in appropriate circumstances, 90 day) "clock" begins to run.[4]

Under section 5(b), Congress may, within the 60 day period, authorize continuing hostilities after that period by any one of three methods: (1) by a declaration of war; (2) by enacting a "specific authorization for such use of United States Armed forces"; or (3) by "extend[ing] by law such sixty-day period." 50 U.S.C. § 1544(b). The section thus functions essentially as a burden-shifting device. As Judge Joyce Hens Green has observed:

> [T]he automatic cutoff after 60 days was intended to place the burden on the President to seek positive approval from the Congress, rather than to require the Congress positively to disapprove the action, which had proven so politically difficult during the Vietnam war. To give force to congressional power to declare war, Presidential warmaking would not be justified by congressional silence, but only by a congressional initiative . . . .

*Crockett v. Reagan*, 558 F. Supp. 893, 899 (D.D.C. 1982), *aff'd*, 720 F.2d 1355 (D.C. Cir. 1983).[5] In addition to requiring the President to seek approval for continuing hostilities, section 5(b) is also designed to hold Congress responsible for the ultimate decision over war and peace.[6]

---

[4] The full text of section 5(b) reads as follows·

Within sixty calendar days after a report is submitted or is required to be submitted pursuant to section 1543(a)(1) of this title, whichever is earlier, the President shall terminate any use of United States Armed Forces with respect to which such report was submitted (or required to be submitted), unless the Congress (1) has declared war or has enacted a specific authorization for such use of United States Armed Forces, (2) has extended by law such sixty-day period, or (3) is physically unable to meet as a result of an armed attack upon the United States Such sixty-day period shall be extended for not more than an additional thirty days if the President determines and certifies to the Congress in writing that unavoidable military necessity respecting the safety of United States Armed Forces requires the continued use of such armed forces in the course of bringing about a prompt removal of such forces

50 U S.C § 1544(b)

[5] *See also* S Rep. No 93–220, at 28 (1973) ("The way the bill is constructed    . the burden for obtaining an extension under section 5 rests on the President He must obtain specific, affirmative, statutory action by the Congress in this respect."), *War Powers Legislation, 1973· Hearings Before the Senate Comm on Foreign Relations*, 93d Cong 243 (1973) (statement by Senator Jacob K. Javits) ("The Senate bill, in Section 5 particularly, is very deliberately constructed so as to throw the burden of proof on the President to convince the Congress, with respect to the question of authorizing an extension of his 'emergency' involvement of the Armed Forces in hostilities. I think it is essential, when the President has acted in the absence of a declaration of war, that the burden be on him to convince the Congress that he has acted in response to a bona fide emergency "); 119 Cong Rec. 24,541 (1973) (remarks of Sen. Javits).

[6] *See* S. Rep. No 93–220, at 19 (WPR "would not have been necessary if Congress had defended and exercised its responsibility in matters of war and peace"); 119 Cong Rec. 24,544–45 (1973) (statement of Sen. Stennis) ("[I]f this bill becomes law it will signal that the members of Congress are willing to assume a heavy duty — the duty

Continued

By its terms, the statute contemplates possible mechanisms for authorizing hostilities other than a declaration of war. The decision as to which legal vehicle to choose is within Congress's power: it is well established that "it is constitutionally permissible for Congress to use another means than a formal declaration of war to give its approval to a war." *Mitchell v. Laird*, 488 F.2d 611, 615 (D.C. Cir. 1973). *See also Montoya v. United States*, 180 U.S. 261, 267 (1901) ("We recall no instance where Congress has made a formal declaration of war against an Indian nation or tribe; but the fact that Indians are engaged in acts of general hostility to settlers, especially if the government has deemed it necessary to despatch a military force for their subjugation, is sufficient to constitute a state of war."); *Berk v. Laird*, 317 F. Supp. 715, 722 (E.D.N.Y. 1970) (noting that plaintiff's memorandum of law had listed 159 instances of the use of U.S. forces abroad from 1798 to 1945, of which only six involved formal declarations of war by either side), *aff'd sub nom., Orlando v. Laird*, 443 F.2d 1039 (2d Cir. 1971); *Hamilton v. McClaughry*, 136 F. 445, 449 (D. Kan. 1905) ("A formal declaration of war . . . is unnecessary to constitute a condition of war."); *United States v. Castillo*, 34 M.J. 1160, 1164 (N.M.C.M.R. 1992) ("Congress may assent to the waging of war by means other than a formal declaration of war, and what form it chooses to record that assent is within its discretion to decide."). Moreover, in the period since the WPR was enacted, Congress has explicitly authorized hostilities under the statute without declaring war.[7] Congress has in fact often authorized hostilities by legislative measures other than formal "declarations of war" since the days of the early republic.[8] Indeed, at the time of the Founding, formal

---

to use their best judgment and to share with the President the responsibility for the most important decision a nation can make, the decision of whether or not to go to war."); Thomas F. Eagleton, *The August 15 Compromise and the War Powers of Congress*, 18 St. Louis U L.J. 1, 8 (1973) ("[I]t should be more apparent now than ever that Congress will not exercise its war powers unless legislation is enacted clearly reaffirming that Congress alone must bear the responsibility for authorizing the commitment of American forces to hostile action."), *War Powers Legislation, 1973: Hearings Before the Senate Comm on Foreign Relations*, 93d Cong. 20 (1973) (statement of Prof Alexander M Bickel, Yale University Law School) ("Congress will not likely—I had nearly said, cannot ever—be brought to resume exercise of its share of the war power through specific actions until it has in declarative fashion reallocated a share of the responsibility to itself. The people tend not to hold Congress responsible, and its own Members tend to avoid the responsibility."), Ely, *supra*, at 48 ("Like the Gramm-Rudman-Hollings Budget Control Act of 1985 and other recent 'framework' legislation, the War Powers Resolution is designed to force a decision regarding matters that Congress has in the past shown itself unwilling to face up to . . . [Section 5(b)] provides that once the Resolution is triggered by the commitment of troops, Congress itself has sixty days to make the critical decision on war and peace ")

[7] The joint resolution authorizing the Persian Gulf War in 1991, Pub L No. 102–1, 105 Stat. 3 (1991) (reprinted at note following 50 U S C § 1541), for example, "is not styled a declaration of war and does not appear to be so," *Castillo*, 34 M.J. at 1164; nonetheless, it unquestionably (and in terms) provided specific statutory authorization within the meaning of section 5(b) for the conflict that ensued, *see* note at § 2(c)(1) ("Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.") (internal citations omitted). Similarly, the Multinational Force in Lebanon Resolution, Pub. L. No 98–119, 97 Stat 805 (1983), *reprinted at* note following 50 U S.C. § 1541, expressly authorized the continued presence of United States Armed Forces in Lebanon for 18 months following the date of the statute's enactment and did not involve a declaration of war *See id.* § 2(c) ("The Congress intends this joint resolution to constitute the necessary specific statutory authorization under the War Powers Resolution for continued participation by United States Armed Forces in the Multinational Force in Lebanon ")

[8] *See, e.g., Bas v. Tingy*, 4 U S (4 Dall.) 37 (1800) (awarding compensation under Act of Congress dealing with recapture of ships from "the enemy", France deemed "the enemy" although Congress had not declared war during

"declarations" of war were increasingly rare in state practice,[9] and prominent legal theorists known to the Founders had analyzed other legal devices for authorizing war.[10] Moreover, whatever their view of the scope of the President's authority to conduct hostilities, scholars agree that Congress could authorize conflict through measures other than a formal declaration of war.[11]

Finally, section 8(a) of the WPR elaborates on the "specific authorization" option:

> Authority to introduce United States Armed Forces into hostilities or into situations wherein involvement in hostilities is clearly indicated by the circumstances shall not be inferred —

period of quasi-war with France after 1798), Abraham D. Sofaer, *War, Foreign Affairs and Constitutional Power The Origins* 139, 164 (1976) (noting that, with respect to the quasi-war with France, President Adams "gradually convinced Congress to authorize hostilities without a declaration" and that, in *Bas v. Tingy*,"[t]he Supreme Court unambiguously confirmed the power of Congress to authorize hostilities in any degree without declaring war"), Gerhard Casper, *Separating Power Essays on the Founding Period* 62 (1997) (discussing Congress's decision not to declare war with Algiers, as requested by President Madison, but to authorize limited naval warfare instead), Louis Fisher, *Presidential War Power* 17–18 (1995) (arguing that Congress had authorized quasi-war with France through several dozen bills supporting military action by President Adams); *id* at 13 (noting that Congress authorized early Indian wars through legislation authorizing protection of frontier); Erwin N. Griswold, *The Indochina War— Is It Legal, reprinted in* 117 Cong Rec 28,977 (1971) ("The notion of a war authorized by Congress in a fashion less dramatic than a formal declaration of war has been accepted since the earliest years of our national existence."), Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power South Vietnam and the Cambodian Sanctuaries* at 25 (May 22, 1970) (The Gulf of Tonkin Resolution "expressly authorized extensive military involvement by the United States . . To reason that if the caption 'Declaration of War' had appeared at the top of the resolution, this involvement would be permissible, but that the identical language without such a caption does not give effective congressional sanction to it at all, would be to treat this most nebulous and ill defined of all areas of the law as if it were a problem in common law pleading."), Alexander M. Bickel, *Congress, the President and the Power to Wage War*, 48 Chi -Kent L Rev. 131, 139–40 (1971) ("[T]here is utterly no reason to think that Congress has only the mega-power to declare war . . . and no mini- or intermediate power to commit the country to something less than a declared war. Congress . . . has the necessary-and-proper power, the power to do anything that is necessary and proper to carry out the functions conferred upon it and upon any other department or officer of the government. If in the conditions of our day it is necessary to carry out the power to declare war by taking measures short of a declaration of war, everything in the scheme of government set up by the Constitution indicates that Congress has the needed authority.").

[9] Thus, when France in 1778 entered the Revolutionary War as an ally of the Colonies against Great Britain, it did not issue a "Declaration of War" —although it did so in June, 1779 *See* Samuel Flagg Bemis, *The Diplomacy of the American Revolution* 136, 145 (1967 reprint of 1935 ed )

[10] *See* W. Taylor Reveley III, *War Powers of the President and Congress: Who Holds the Arrows and Olive Branch?* 54–55 (1981) (Legal theorists known to Founders had "examined in detail undeclared or 'imperfect' war, noting that it was generally limited in scope, designed to redress grievances, and prosecuted through restricted government action or private war making under letters of marque and reprisal [U]ndeclared war was the norm in eighteenth-century European practice, a reality brought home to Americans when Britain's Seven Years' War with France began on this continent." ) *See also The Federalist No. 25*, at 161 (A. Hamilton) (Jacob E. Cooke ed , 1961) ("[T]he ceremony of a formal denunciation of war has of late fallen into disuse "), William Michael Treanor, *Fame, The Founding, and The Power to Declare War*, 82 Cornell L Rev. 695, 709 (1997).

[11] *See, e g ,* Ely, *supra*, at 25 (noting that the idea that congressional combat authorizations must be labeled "declarations of war" is "manifestly out of accord with the specific intentions of the founders" and that "most eighteenth-century wars were not 'declared' in so many words, a fact of which the founders took specific and approving note "), Fisher, *supra*, at 9 (1995) ("The framers were well aware that nations approved war either by declaration or authorization "), Charles A Lofgren, *War-Making Under the Constitution: The Original Understanding*, 81 Yale L J. 672, 694 (1972) ("In sum, familiarity with Grotius and his successors and with then-recent history would have suggested to one in the late 1780's that undeclared war was no oddity .").

> (1) from any provision of law . . . including any provision con-
> tained in any appropriations Act, unless such provision specifically
> authorizes the introduction of United States Armed Forces into hos-
> tilities or into such situations and states that it is intended to con-
> stitute specific statutory authorization within the meaning of this
> chapter.

50 U.S.C. § 1547(a)(1).

Like section 5(b), section 8(a) implicitly recognizes that Congress may authorize hostilities by means other than a declaration of war. Because it purports to allow Congress to authorize hostilities through appropriation statutes that specifically invoke the WPR, section 8(a) further recognizes that appropriation statutes may, under some circumstances, authorize hostilities.

## II. Appropriations and Authorization of Military Combat

The Supreme Court has recognized that, as a general matter, appropriation stat-
utes may "stand[ ] as confirmation and ratification of the action of the Chief Executive." *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 116 (1947). Congress may also "amend substantive law in an appropriations statute, as long as it does so clearly." *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 440 (1992). "[W]hen Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that . . . it could accomplish its purpose by an amend-
ment to an appropriation bill, or otherwise.' *United States v. Dickerson*, 310 U.S. 554, 555 (1940). 'The whole question depends on the intent of Congress as expressed in the statutes.' *United States v. Mitchell*, 109 U.S. 146, 150 (1883)." *United States v. Will*, 449 U.S. 200, 222 (1980).

Indeed, on numerous occasions, the Supreme Court has applied this general principle to find that Congress had authorized or ratified executive branch action through appropriation measures. For example, in *Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 147 (1937), the Court held that Congress had ratified the abolition of the Shipping Board and the transfer of its functions to the Department of Commerce by a series of subsequent appropriation acts. Likewise, in *Wells v. Nickles*, 104 U.S. 444, 447 (1881), the Court found that Congress had author-
ized the Department of the Interior to appoint agents to protect timber on govern-
ment land through "appropriations made to pay for the services of these special timber agents." And in *Ludecke v. Watkins*, 335 U.S. 160, 173 n.19 (1948), the Court explained that Congress had "recognized . . . the President's powers under the Alien Enemy Act of 1798" to remove enemy aliens summarily in time of declared war "by appropriating funds" for the maintenance, care, detention, surveillance, and transportation of such aliens. *See also Ex Parte Mitsuye Endo*, 323 U.S. 283, 303 n.24 (1944) (noting that to authorize executive action through

appropriations, Congress "must plainly show a purpose to bestow the precise authority which is claimed"); Myres S. McDougal & Asher Lans, *Treaties and Congressional-Executive or Presidential Agreements: Interchangeable Instruments of National Policy*, 54 Yale L.J. 181, 271 (1945) (noting that Congressional approval of American membership in international organizations such as the Pan-American Union "may readily be inferred from [a] long series of acts appropriating funds to defray the United States' aliquot portion of operating expenses").

   The notion that Congress can authorize hostilities through appropriation laws follows directly from this general principle. As Ely explains:

> Throughout the course of the [Vietnam] war, hundreds of billions of dollars were appropriated to support it, and the draft was repeatedly extended. Supporters understandably cited these measures as further congressional authorization.

> The law generally pertaining to authorization by appropriation is about what first-order common sense suggests it should be. If there is no reason to infer that Congress knew what the agency or program in question was about, the fact that it was buried in an appropriations measure is typically not taken to constitute authorization of it. If the program was conspicuous, it is. Indeed, assuming sufficient notice of what was going on, appropriations may in some ways constitute unusual evidence of approval, in that typically Congress acts twice — once to authorize the expenditure and again to appropriate the money.

Ely, *supra*, at 27. Indeed, Congress has on numerous occasions authorized U.S. involvement in armed conflict at least in part through appropriation laws. As we explained in our 1984 overview of the WPR, "[p]rior to the enactment of the WPR, many enactments of Congress, especially appropriations measures, could justifiably have been regarded by the Executive as constituting implied authority to continue the deployment of our armed forces in hostilities." 8 Op. O.L.C. at 273 n.4. In several instances in early Administrations, appropriation laws played an important role in authorizing or ratifying presidential use of the Armed Forces in situations of conflict. For example, President George Washington "used force against the Wabash Indians pursuant to a statute that provided forces and authorized the call-up of militia to protect frontier inhabitants from the hostile incursions of Indians. This statute, along with the requests and debates that accompanied it, *and the appropriations that followed its adoption*, made clear that Congress approved the military engagements Washington undertook against the Wabash." Abraham D. Sofaer, *The Power Over War*, 50 U. Miami L. Rev. 33, 41 (1995) (emphasis added) (footnote omitted); *see also* John C. Yoo, *The Continuation of*

*Politics By Other Means: The Original Understanding of War Powers*, 84 Cal. L. Rev. 167, 291 (1996) (noting of Washington's campaign against the Indians in the Northwest that "Congress' approval of the appropriation . . . constituted an explicit authorization of the President's war plans."). Congress also authorized President Adams to conduct the undeclared Quasi-War against France in part by appropriating funds to strengthen the military. *See* Sofaer, *War, Foreign Affairs and Constitutional Power, supra* at 139–66 (describing appropriation laws and other measures by which Congress authorized hostilities against France); Yoo, *supra*, at 292 ("Congress approved Adams' designs to wage a naval war against France by supplying the funds for the bulked up military."). Another instance in which appropriation laws or procurement statutes were thought by some members of Congress to provide some measure of authority for the use of force occurred in the course of the Monroe Administration's efforts to annex Florida. *See* Sofaer, *The Power Over War, supra*, at 47–48 ("A long and important Congressional debate followed these events. . . . The classic arguments concerning the meaning of the power to declare war were made on both sides of the issue, including the argument that Congress had authorized the actions in Florida by providing the funds to pay the militia."); *see also* David P. Currie, *Rumors of Wars: Presidential and Congressional War Powers, 1809–1829*, 67 U. Chi. L. Rev. 1, 14–15 (2000) (noting George Poindexter's argument that Congress had authorized President Monroe to order General Jackson to cross into Spanish territory to wage defensive war on the Seminoles by appropriating funds for the action).

So-called "Indian" wars, which were common in American history, were also not declared wars; rather, Congress was said to have authorized or ratified them by a variety of means, including voting appropriations to pay the troops called out and to defray the expenses of campaigns. *See Alire v. United States*, 1 Ct. Cl. 233, 238 (1865) (quoting report of the Secretary of War that says: "And Congress has seldom failed to recognize and ratify [the so-called 'Indian wars'], by voting appropriations and to pay the troops called out and defray the expenses incident to such expeditions."), *rev'd on other grounds*, 73 (6 Wall.) U.S. 573 (1867). In 1838, Attorney General Butler opined that war had been waged on the Seminole Indians "by authority of the legislative department, to whom the power of making war has been given by the constitution," because Congress had both "recognised the commencement of these hostilities," and appropriated money to suppress them," and because it had later made "[s]everal appropriations for the same object." *Existence of War With the Seminoles*, 3 Op. Att'y Gen. 307 (1838). In 1905, a district court held that President McKinley's intervention in China during the Boxer Rebellion constituted war, and was ratified by Congress's decision to vote wartime pay to the troops who served on the expedition. *See Hamilton*, 136 F. at 451. It has also been argued that Congress ratified the Korean War by enacting several major pieces of war-related legislation during that con-

flict, including a bill to increase taxes by \$4.7 billion to help pay for the war. *See* Ely, *supra*, at 11 ("[B]efore the war was over Congress had voted draft extensions and special appropriations which by some people's lights constituted sufficient authorization . . . .").

The most conspicuous example of Congress authorizing hostilities through its appropriations power occurred during the War in Vietnam. *See* William C. Banks & Peter Raven-Hansen, *National Security Law and the Power of the Purse* 119 (1994) ("The paradigm of what we have called legitimating appropriations — appropriation measures from which the executive infers authority for national security actions — is the succession of appropriations for military activities in Southeast Asia during the Vietnam War."). In that war, the State Department Legal Adviser argued that Congress had authorized the conflict, not only through the Gulf of Tonkin Resolution, 78 Stat. 384 (1964), but also by enacting supplemental appropriations bills. Noting that the Gulf of Tonkin Resolution provided that Congress could terminate that statute by concurrent resolution, and that Congress had not in fact done so, Leonard Meeker, the State Department's Legal Adviser during the Johnson Administration, pointed out that

> [i]nstead, Congress in May 1965 approved an appropriation of \$700 million to meet the expense of mounting military requirements in Viet-Nam. (Public Law 89–18, 79 Stat. 109.) The President's message asking for this appropriation state[s] that this was "not a routine appropriation. For each Member of Congress who supports this request is also voting to persist in our efforts to halt Communist aggression in South Vietnam." The appropriation act constitutes a clear congressional endorsement and approval of the actions taken by the President.

> On March 1, 1966, the Congress continued to express its support of the President's policy by approving a \$4.8 billion supplemental military authorization by votes of 392–4 and 93–2. An amendment that would have limited the President's authority to commit forces to Viet-Nam was rejected by a vote of 94–2.

Leonard C. Meeker, *The Legality of United States Participation in the Defense of Viet-Nam*, 54 Dep't St. Bull. 474, 487–88 (1966) (footnote omitted).[12]

Five years later, the Solicitor General Erwin Griswold made similar arguments. Maintaining that the Vietnam War was congressionally authorized, Griswold said:

---

[12] Senator Eagleton objected to the State Department's reasoning because "I could not accept the idea that broad appropriations acts authorizing money for a large number of vital governmental functions could be read as specific authorizations for hostilities." Eagleton, *supra*, at 125. However, the State Department's argument rested, not on such broad appropriation acts, but on specific appropriations for the war in Vietnam *See* Pub L No 89–18, 79 Stat 109 (1965) (appropriating \$700 million "upon determination by the President that such action is necessary in connection with military activities in southeast Asia")

Perhaps even more important than the Tonkin Gulf Resolution is the fact that Congress has consistently backed and supported the actions of the President in all the intervening years. Early in 1965, President Johnson asked for and obtained a special appropriation of seven hundred million dollars, for the express purpose of carrying on military action in Southeast Asia. This was granted by an Act of Congress approved on May 7, 1965. The vote in Congress was 408 to 7 in the House, and 83 to 3 in the Senate. This is an unusual appropriations act, in that it consists of a single item. Thus, there is no possibility that it passed through Congress by inadvertence, or that the report for it may have been coerced, as in the case of a rider. . . . After this, there were many legislative acts by Congress, taken in full knowledge of the situation in Southeast Asia, and in support of the President's actions.

Erwin N. Griswold, *The Indochina War—Is It Legal?*, reprinted in 117 Cong. Rec. 28,978 (1971).

Several courts and legal scholars have agreed that the appropriations provided by Congress to fund the war played an important (and in some cases dispositive) role in authorizing armed conflict in Vietnam. For example, directly following his observation that Congress can authorize executive action through appropriations if the program in question is "conspicuous," Professor Ely notes: "In this case, it would be an understatement to say that the program for which Congress was appropriating funds (and extending the draft) was conspicuous. In May of 1965 Congress enacted a special appropriation of $700 million for 'military activities in southeast Asia.'" Ely, *supra*, at 27; *see also id.* at 27–30 (explaining why appropriations constituted authorization and rejecting arguments to the contrary); *Da Costa v. Laird*, 448 F.2d 1368, 1369 (2d Cir. 1971) ("[T]here was sufficient legislative action in extending the Selective Service Act and in appropriating billions of dollars to carry on military and naval operations in Vietnam to ratify and approve the measures taken by the Executive, even in the absence of the Gulf of Tonkin resolution."); *Berk*, 317 F. Supp. at 724–28 (reviewing appropriations acts for Vietnam War, and holding that they authorized hostilities); *Orlando*, 443 F.2d at 1042 (identifying appropriation bills, as well as the Tonkin Gulf Resolution and the extension of the Military Selective Service Act, as demonstrating that "[t]he Congress and the Executive have taken mutual and joint action in the prosecution and support of military operations in Southeast Asia from the beginning of those operations"); *Mitchell*, 488 F.2d at 615 (concluding otherwise but noting that "[t]he overwhelming weight of authority . . . holds that the appropriation, draft extension, and cognate laws enacted with direct or indirect reference to the Indo-China war . . . did constitute a constitutionally permissible form of assent."); Philip Bobbitt, *War Powers: An Essay on John Hart Ely's War and*

*Responsibility: Constitutional Lessons of Vietnam and Its Aftermath*, 92 Mich. L. Rev. 1364, 1392 (1994) ("[S]tatutes — defense appropriation acts, defense authorizations — can serve as the basis on which the President may validly commit U.S. forces without further returning to Congress for fresh mandates beyond those given by statute. This was the history of the entirely valid constitutional authorization of the Vietnam War, and Ely forthrightly, and, I think, courageously, acknowledges this."); Norman A. Graebner, *The President As Commander in Chief: A Study in Power*, in *Commander in Chief: Presidential Leadership in Modern Wars* 42 (Joseph G. Dawson, III ed., 1993) ("A congressional majority underwrote the war in Vietnam from 1961 until 1973 through its power of the purse; that war always belonged to Congress as much as to the presidents. They fought it together.").[13]

Finally, although the court of appeals in *Holtzman v. Schlesinger*, 484 F.2d 1307, 1313 (2d Cir. 1973), invoked the political question doctrine and thus did not reach the merits of the claim that President Nixon lacked the authority for the bombing of Cambodia after the cease-fire in Vietnam and the removal of United States prisoners of war from that country, it indicated that, if it had reached the merits, it would have found that a provision of the Joint Resolution Continuing Appropriations for Fiscal 1974, Pub. L. No. 93–52 (1973), "support[ed] the proposition that the Congress has approved the Cambodian bombing." *See also* Thomas F. Eagleton, *The August 15 Compromise and the War Powers of Congress*, 18 St. Louis U. L.J. at 1 ("On June 29 . . . [i]t was clear that neither the American people nor Congress wanted a continuation of the bombing. But before that legislative day was over, Congress would authorize a forty-five day war in Indochina.").

Some have argued that, on the contrary, appropriation statutes that fund ongoing war efforts do not constitute authorization of those war efforts. *See* Francis D. Wormuth & Edwin B. Firmage, *To Chain the Dog of War: The War Power of Congress in History and Law* 227–34 (2d ed. 1989); *War Powers Legislation: Hearings Before the Senate Comm. on Foreign Relations*, 92d Cong. 23 (1973) (statement of Professor Alexander M. Bickel) ("To appropriate money in support of a war the President is already waging, it seems to me, is no more to ratify his action in responsible fashion than to appropriate money for the payment of

---

[13] It has also been suggested that even after the repeal of the Gulf of Tonkin Resolution, *See* Pub. L No. 91–672, § 12, 84 Stat. 2053, 2055 (1971) (repealing Gulf of Tonkin Resolution), Congress' continuing appropriations for the war effort were sufficient to authorize continuing hostilities in Vietnam. As Ely notes

> [The intentions of those who voted to repeal the Tonkin Gulf Resolution] would not have mattered, had the Tonkin Gulf Resolution stood as of 1971 as the only congressional authorization for the war· When the only authorization goes, the war goes, irrespective of what people think they are up to However, by 1971 the situation was far from that: Congress had by then, by a number of appropriations measures, quite pointedly reiterated its authorization of the war. Moreover, and not surprisingly under the circumstances, it continued after its repeal of the Tonkin Gulf Resolution to appropriate funds for military activities in Southeast Asia, and to extend the draft

> Tantalizing as the repeal must thus have seemed to those wishing to mount a legal attack on the war, it unfortunately was just more of Congress's playing Pontius Pilate

Ely, *supra*, at 33

his salary."); *Mitchell*, 488 F.2d at 615 ("This court cannot be unmindful of what every schoolboy knows: that in voting to appropriate money or to draft men a Congressman is not necessarily approving of the continuation of a war no matter how specifically the appropriation or draft act refers to that war."); *Campbell*, 203 F.3d at 31 n.10 (Randolph, J., concurring) (citing and quoting *Mitchell* for the same proposition). This argument can take one of two forms. First, one could argue that a general defense-related appropriation statute does not authorize the ongoing hostilities because it provides only general defense-related funds and does not indicate any approval of the specific hostilities at issue. While this might be true, it does not undermine the basic principle explained above — that an appropriation statute specifically and conspicuously aimed at funding hostilities may constitute authorization of those hostilities. Second, some have argued that appropriations, regardless of how specific they may be with respect to ongoing war efforts, should not be interpreted to authorize continuing military operations because those appropriations could just as easily be understood as providing resources for men and women already in combat, simply to ensure that they do not suffer as a result of a disagreement between the Executive and the Congress regarding the wisdom of the deployment. *See, e.g., Mitchell*, 488 F.2d at 615 (declining to decide whether President Nixon had exceeded his constitutional power on political question grounds, but noting that, "in voting to appropriate money or to draft men a Congressman is not necessarily approving the continuation of a war no matter how specifically the appropriation or draft act refers to that war. . . . An honorable, decent, compassionate act of aiding those already in peril is no proof of consent to the actions that placed and continued them in that dangerous posture.").[14] Although this may be true in some cases, in other cases, as Ely explains, this proposition "doesn't make sense . . . [because] Congress could [phrase] its funds cut-off as a phase out, providing for the protection of the troops as they [are] withdrawn." Ely, *supra*, at 29. Congress took such a step with respect to hostilities in Somalia in November of 1993, when it provided that funds could be obligated beyond March of 1994 only "to protect American diplomatic facilities and American citizens, and noncombat personnel to advise the United Nations commander in Somalia." Pub. L. No. 103–139, § 8151(b)(2)(B), 107 Stat. 1418, 1476 (1993). Alternatively, Congress could preclude the use of funds to introduce additional troops, as it did through the 1971 Cooper-Church Amendment, which provided that "none of the funds authorized or appropriated pursuant to this or any other Act may be used to finance the introduction of United States ground combat troops into Cambodia, or to provide United States advisers to or for Cambodian military forces in Cambodia." Pub.

---

[14] *See also* Note, *Congress, The President, and the Power to Commit Forces to Combat*, 81 Harv. L Rev 1771, 1801 (1968) ("The difficulty with the argument [that appropriations constitute approval of warmaking] is that since such appropriations must generally come after the hostilities have already begun, the effective choice remaining to Congress is likely to be severely limited ")

L. No. 91–652, § 7(a), 84 Stat. 1942, 1943 (1971).[15] In the end, the question whether a particular targeted appropriation constitutes authorization for continuing hostilities will turn on the specific circumstances of each case.[16]

In sum, basic principles of constitutional law — and, in particular, the fact that Congress may express approval through the appropriations process — and historical practice in the war powers area, as well as the bulk of the case law and a substantial body of scholarly opinion, support the conclusion that Congress can authorize hostilities through its use of the appropriations power. Although it might be the case that general funding statutes do not necessarily constitute congressional approval for conducting hostilities, this objection loses its force when the appropriations measure is directly and conspicuously focused on specific military action.

## III. Appropriations and the War Powers Resolution

This section analyzes whether the WPR bars Congress from authorizing military operations through an appropriation measure unless the appropriation measure "states that it is intended to constitute specific statutory authorization within the meaning of this chapter." 50 U.S.C. § 1547(a)(1) (section 8(a)(1) of the WPR). We conclude that the WPR does not constitute such a bar, but instead has the effect of establishing a background principle against which to interpret later Acts of Congress.

Section 5(b) of the WPR permits continuation of hostilities when a congressional enactment represents "specific authorization for such use of United States Armed Forces." 50 U.S.C. § 1544(b). As has been discussed, courts, government officials, and scholars have repeatedly (although not uniformly) recognized that appropriation statutes may constitute authorization for conflict. Thus, if the WPR did not provide any further interpretive gloss on the question, it would appear that an appropriation statute — if enacted for the purpose of continuing hostilities — would be "specific authorization." Section 8(a) of the WPR, however, provides that authority "shall not be inferred . . . from any provision of law

---

[15] Banks and Raven-Hansen explain the difficulty with the objection that it is impossible to construe national security appropriations as ratification because of the circumstances of their enactment:

The objection is exaggerated and ahistorical It seems to proceed on the assumption that Congress's choices are all or nothing, fund or deny all funding. But the Vietnam War itself showed that Congress has intermediate options, including funding phaseouts, prospective cutoffs, and, subject to separation of powers limits, area limitations. In fact, given the scope of the president's commander-in-chief powers, it is doubtful that Congress constitutionally *could* cut off the funds so abruptly that American lives would be placed at grave risk

Banks & Raven-Hansen, *supra,* at 135 In addition to the Vietnam phase-out appropriations, Banks and Raven-Hansen also point to the Boland Amendments, which limited how funds appropriated for support of the Contras could be used, *see, e g.,* Pub. L. No. 97–377, § 793, 96 Stat. 1830, 1865 (1982) (providing that funds could not be used by the Central Intelligence Agency or the Department of Defense to "furnish military equipment, military training or advice . . . for the purpose of overthrowing the Government of Nicaragua or provoking a military exchange between Nicaragua and Honduras"), as an example of such a "restrictive appropriation " *See* Banks & Raven-Hansen, *supra,* at 137–48.

[16] We explain in Part IV, *infra,* why the circumstances here lead us to conclude that Pub L No 106–31 constituted authorization for continuing hostilities in the Federal Republic of Yugoslavia

. . . including any provision contained in any appropriations Act, unless such provision specifically authorizes the introduction of United States Armed Forces into hostilities or into such situations and states that it is intended to constitute specific statutory authorization within the meaning of this chapter.'' 50 U.S.C. § 1547(a). In assessing whether an appropriation statute can constitute authorization, the critical question thus becomes how to understand section 8(a)(1).

The precursor of section 8(a)(1) is section 3(4) of S. 440, the version of the WPR passed by the Senate. That section provided that a specific statutory authorization shall not be inferred (A) from any provision of law hereafter enacted, including any provision contained in any appropriations Act, unless such provision specifically authorizes the introduction of such Armed Forces in hostilities . . . and specifically exempts the introduction of such Armed Forces from compliance with the provisions of this Act.[17]

The most significant interpretive guide to this language is the Senate Report, which stated: ''The purpose of this clause is to counteract the opinion in the *Orlando v. Laird* decision of the Second Circuit Court holding that passage of defense appropriations bills, and extension of the Selective Service Act, could be construed as implied Congressional authorization for the Vietnam war.'' S. Rep. No. 93–220, at 25. In *Orlando*, the court of appeals had rejected the argument of the plaintiff enlisted men that ''congressional authorization cannot, as a matter of law, be inferred from military appropriations or other war-implementing legislation that does not contain an express and explicit authorization for the making of war by the President.'' 443 F.2d at 1043.

The House version of the WPR did not contain an analogous provision.[18] The Conference Report indicates that the Senate version was the source of the ''specific statutory authorization'' language in the final bill. See H.R. Conf. Rep. No. 93–547, at 2 (1973). That language, according to the Senate report on S. 440, was intended to ''guard against the passage of another resolution of the Tonkin Gulf type'' by requiring that ''any area resolutions, to qualify under this bill as a grant of authority to introduce the armed forces into hostilities . . . meet certain carefully drawn criteria — as spelled out in the language of [§ 8(a)(1)].'' S. Rep. No. 93–220, at 24. The Report further explained that ''authorization to continue using the Armed Forces is to come in the form of specific statutory [authorization] for this purpose. This is to avoid any ambiguities such as possible efforts to construe general appropriations or other such measures as constituting the necessary

---

[17] S 440, as passed by the Senate on July 20, 1973, is reprinted in William B Spong, Jr., *The War Powers Resolution Revisited: Historic Accomplishment or Surrender?*, 16 Wm & Mary L. Rev 823, 878–82 (1975).

[18] Section 4(b) of H.J. Res. 542, passed by the House on July 18, 1973, provided that ''[w]ithin one hundred and twenty calendar days after a report is submitted or is required to be submitted pursuant to section 3, the President shall terminate any commitment and remove any enlargement of United States Armed Forces with respect to which such report was submitted, unless the Congress enacts a declaration of war or a specific authorization for the use of United States Armed Forces,'' but the House version neither defined ''specific authorization'' nor provided that an appropriations measure not referring back to the WPR could not constitute such an authorization. See Spong, *supra*, at 874–77 (reprinting H J. Res. 542)

authorization for such 'continued use.' " *Id.* at 29. Congress thus required that authorizing legislation expressly reference the WPR to avoid "any ambiguities" regarding congressional intent to sanction continued hostilities.

To the extent, however, that this interpretation would take from Congress a constitutionally permissible method of authorizing war, it runs afoul of the axiom that one Congress cannot bind a later Congress. *See, e.g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803) (noting that, in contrast to a constitution, legislative acts are "alterable when the legislature shall please to alter [them]"); *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 135 (1810) (noting that "[t]he correctness of [the] principle," "that one legislature is competent to repeal any [law] which a former legislature was competent to pass, and that one legislature cannot abridge the powers of a succeeding legislature," "can never be controverted"); *Street v. United States,* 133 U.S. 299, 300 (1890) (statute "was not intended to have, [and] could not have, any effect on the power of a subsequent Congress" to enact a different policy).[19] Underlying this axiom is the principle that one Congress cannot surrender through legislation power that the Constitution vests in Congress. To believe otherwise would be to assume that "new legislators [could] automatically be bound by the policies and undertakings of earlier days." *United States Trust Co.,* 431 U.S. at 45 (Brennan, J., dissenting).

Applying this general principle to the issue of section 8(a)(1)'s constitutionality, Professor Philip Bobbitt has argued that, were section 8(a)(1) read to bind subsequent Congresses, it would be unconstitutional:

> [F]ramework statutes — like Gramm-Rudman, for example — cannot bind future Congresses. If Congress can constitutionally authorize the use of force through its appropriations and authorization procedures, an interpretive statute that denies this inference — as does . . . the original War Powers Resolution — is without legal effect. On the other hand, if one Congress could bind subsequent Congresses in this way, it would effectively enshrine itself in defiance of [an] electoral mandate. Imagine, for example, a statute that provided that no appropriations or authorization provision shall exceed a term of six months or an act that forbade the President from interpreting any subsequent statute as permitting him to issue regulations to enforce that statute unless specifically authorized to

---

[19] *See also United States Trust Co v. New Jersey,* 431 U.S 1, 45 (1977) (Brennan, J., dissenting); *Community-Service Broad. of Mid-America, Inc. v. FCC,* 593 F 2d 1102, 1113 (D C Cir. 1978) ("Congress is generally free to change its mind, in amending legislation Congress is not bound by the intent of an earlier body "); *Puerto Rico — United States Bilateral Pact of Non-territorial Permanent Union and Guaranteed Citizenship Act. Hearing on H.R. 4751, Before the House Comm. on Resources,* 107th Cong. 17 (2000) (Statement of William M Treanor, Deputy Assistant Attorney General, Office of Legal Counsel) ("[A]s a general matter, one Congress cannot bind a subsequent Congress "); Memorandum for the Special Representative for Guam Commonwealth, from Teresa Wynn Roseborough, Deputy Assistant Attorney General, *Re. Mutual Consent Provisions in The Guam Commonwealth Legislation* 6 (July 28, 1994) ("[O]ne Congress cannot bind a subsequent Congress, except where it creates vested rights enforceable under the Due Process Clause of the Fifth Amendment ")

> do so therein. A rule of interpretation, if it contravenes a valid con-
> stitutional power — in this case, . . . that a subsequent Congress
> could constitutionally endorse a war by an appropriations and
> authorization statute — would amount to a restriction on the ability
> of a Congress to repeal by inference preexisting law. Such a fresh
> hurdle to later legislation is nowhere authorized by the Constitution
> and is inconsistent with the notion of legitimacy derived through
> the mandate of each new Congress.

92 Mich. L. Rev. at 1399.[20]

This argument is compelling. If section 8(a)(1) were read to block all possibility of inferring congressional approval of military action from any appropriation, unless that appropriation referred in terms to the WPR and stated that it was intended to constitute specific authority for the action under that statute, then it would be unconstitutional. As discussed in the previous section, under the Constitution, Congress can authorize or ratify presidential engagement in hostilities through an appropriation law. One statute, such as the WPR, cannot mandate that certain types of appropriation statutes that would otherwise constitute authorization for conflict cannot do so simply because a subsequent Congress does not use certain "magical passwords." *Marcello v. Bonds*, 349 U.S. 302, 310 (1955) (holding that detailed procedures established by the Immigration and Naturalization Act applied despite discrepancies between that Act and the Administrative Procedure Act ("APA") and despite the fact that the APA provided that exemptions from its requirements must be expressly indicated). As Banks and Raven-Hansen have put it, "[i]t follows that the 93d Congress that enacted the War Powers Resolution cannot control the way in which [a later] Congress express[es] their intent." Banks & Raven-Hansen, *supra*, at 131.

In order to avoid this constitutional problem, we do not interpret section 8(a)(1) as binding future Congresses but instead as having the effect of establishing a background principle against which Congress legislates. In our view, section 8(a)(1) continues to have operative legal effect, but only so far as it operates to inform how an executive or judicial branch actor should interpret the intent

---

[20] In Congressional testimony in 1986, the Legal Adviser to the State Department, Abraham Sofaer, found that "serious constitutional problems exist with respect to Section 8(a)," because "one Congress by statute can[not] so limit the constitutional options of future Congresses." *See* Abraham D. Sofaer, *The War Powers Resolution and Antiterrorist Operations*, 86 Dept St. Bull 68, 69 (Aug 1986). In 1988, however, Judge Sofaer cast the problem primarily as a matter of construction, not of constitutionality, although it would appear that Judge Sofaer's construction of the statute was intended to avoid constitutional concerns *See The War Power After 200 Years Congress and the President at a Constitutional Impasse Hearings Before the Special Subcomm. On War Powers of the Senate Comm. On Foreign Relations*, 100th Cong 148 (1988) (testimony of Legal Adviser Sofaer) ("Section 8. The problem there is not so much constitutional      Section 8 was an effort to get people to focus on the War Powers Resolution, but not an effective effort in limiting the types of approvals that can be obtained."), *id.* at 1066 ("In our view, Section 8(a) ineffectively attempts to restrict the rights of future Congresses to authorize deployments in any way they choose "). As President Nixon correctly said in his Veto Message following initial passage of the WPR, Congress can affect the Executive's conduct of military operations through a variety of means, and "[t]he authorization and appropriations process represents one of the ways in which such influence can be exercised." Pub Papers of Richard Nixon 893, 895 (1973).

of subsequent Congresses that enact appropriation statutes that.do not specifically reference the WPR.[21] On the question whether an appropriation statute enacted by a subsequent Congress constitutes authorization for continued hostilities, it is the intent of the subsequent Congress, as evidenced by the text and legislative history of the appropriation statute, that controls the analysis. The existence of section 8(a)(1) might affect this analysis. If the appropriation statute is entirely ambiguous as to whether it constitutes authorization for continuing hostilities, for example, it might be proper for a judicial or executive branch actor to conclude that, because the subsequent Congress was aware of the background principle established by section 8(a)(1), its failure to refer specifically back to the WPR evidences an intent not to authorize continuing hostilities. If, however, Congress, in enacting an appropriation statute, demonstrates a clear intent to authorize continuing hostilities, then it would be appropriate to conclude that the appropriation statute does authorize those hostilities, even though the statute does not specifically refer back to the WPR. Under these circumstances, the appropriation statute would supersede or work an implied partial repeal of section 8(a)(1).[22] In other words, section 8(a)(1) establishes procedural requirements that, under the statute, Congress must follow to authorize hostilities; nonetheless, a subsequent Congress remains free to choose in a particular instance to enact legislation that clearly authorizes hostilities and, in so doing, it can decide not to follow the WPR's procedures. This position is consistent with the approach taken by our Office at about the time of the WPR's enactment. In a 1973 opinion, we stated:

> Strictly speaking, such a provision [§ 8(a)(1)] is probably not binding on future Congresses. For example, should the legislative history of a future appropriations statute make it clear that particular hostilities are authorized, that should constitute a valid authorization, because future Congresses are free to adopt any of the customary modes of manifesting their intention. However, as a practical matter, a court would probably attach some significance to this subsection should a claimed statutory authorization for hostilities be doubtful.

---

[21] *Cf* Cass R Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv L. Rev 405, 452 (1989) (noting that canons of construction have "actually influenced judicial behavior insofar as they reflected background norms that helped to give meaning to statutory words or to resolve hard cases")

[22] Although the law disfavors implied repeals, particularly with respect to appropriation statutes, *see Tennessee Authority v. Hill*, 437 U.S. 153, 190 (1978), the presumption against implied repeals can be overcome if the statutory language or legislative history evidences an intent to repeal the prior statute. *See Will*, 449 U.S at 222 ("[W]hen Congress desires to suspend or repeal a statute in force, there can be no doubt that . . it could accomplish its purpose by an amendment to an appropriation bill, or otherwise . . The whole question depends on the intention of Congress as expressed in the statutes." (citations and internal quotation marks omitted)) As described below, this standard is satisfied here.

Memorandum for the Hon. William E. Timmons, Assistant to the President for Legislative Affairs, from Robert G. Dixon, Assistant Attorney General, Office of Legal Counsel, *Re: The "War Powers Resolution"* at 15 (Nov. 16, 1973).

This reading of section 8(a)(1) finds support in a series of cases interpreting statutes similar in form to section 8(a)(1). For example, in the case of *Great N. Ry. Co. v. United States*, 208 U.S. 452 (1908), the Court addressed whether one criminal law repealed a prior criminal law so as to deprive the government of the right to prosecute for violations of the prior law committed before the subsequent law was enacted. The Court considered this question in light of section 13 of the Revised Statutes,[23] which provided that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty . . . incurred under such statute, unless the repealing act shall so expressly provide." *Id.* at 465. In addressing the effect of section 13 on the interpretation of the subsequent criminal law, the Court wrote: "As the section of the Revised Statutes in question has only the force of a statute, its provisions cannot justify a disregard of the will of Congress as manifested, either expressly or by necessary implication, in a subsequent enactment." *Id.* The Court observed that section 13 "must be enforced unless, either by express declaration or necessary implication, arising from the terms of the law as a whole, it results that the legislative mind will be set at naught by giving effect" to that section. *Id. See also Hertz v. Woodman*, 218 U.S. 205, 218 (1910) ("The repealing act here involved includes a saving clause, and if it necessarily, or by clear implication, conflicts with the general rule declared in § 13, the latest expression of the legislative will must prevail."); *Warden v. Marrero*, 417 U.S. 653, 659 n.10 (1974) ("[O]nly if [the subsequently enacted statute] can be said by fair implication or expressly to conflict with [the previously enacted saving clause] would there be reason to hold that [the subsequently enacted statute] superseded [the saving clause]."); *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 787, 789 (1st Cir. 1996) (characterizing a law that provided that "[t]he provisions of any federal law . . . for the benefit of Indians . . . shall not apply within the State of Maine, unless such provision of such subsequently enacted Federal law is specifically made applicable within the State of Maine" as "an interpretive aid [that] serves both to limn the manner in which subsequently enacted statutes should be written to accomplish a particular goal and to color the way in which such statutes thereafter should be read," and noting that "[the law] binds subsequent Congresses only to the extent that they choose to be bound"). The Supreme Court's observation that a statute should not be given effect if, "by express declaration or necessary implication, arising from the terms of the law as a whole, it results that the legislative mind will be set at naught," *Great N. Ry. Co.*, 208 U.S. at 465, is consistent with the view expressed in our 1973 opinion that a statute evidencing a "clear" intent to authorize hostilities will operate to authorize those hostilities even though it does not refer back to

---

[23] Rev. Stat § 13, U.S. Comp. Stat 1901, p 6.

the WPR. To interpret section 8(a)(1) to bar such a statute from authorizing hostilities would set the "legislative mind" that enacted the appropriation statute "at naught." [24]

Academic commentators have understood section 8(a)(1) in a similar fashion. Professors Banks and Raven-Hansen, for example, have argued that although section 8(a)(1) counsels against inferring authorization from an ambiguous appropriation law, an appropriation statute that clearly authorizes hostilities nonetheless constitutes authorization for those hostilities despite section 8(a)(1):

> We conclude . . . that the resolution's clear statement requirement does not control the construction of subsequent appropriations or other legislation. Instead, absent ambiguities, it is their own plain words and their enactors' legislative intent that controls their construction. As a result, a legitimating appropriation may authorize or ratify a deployment of U.S. armed forces into hostilities even if it omits the resolution's magic passwords and thus violates its clear statement provision. . . . This is not to make a dead letter out of the whole of the War Power Resolution's rule of construction. Its self-referential insistence on "passwords" is without effect. We never have occasion to need the rest of it, if we can ascertain the meaning and intent of a legitimating appropriation from its plain words or clear legislative history. If we cannot, then the resolution's clear statement requirement sounds a useful advisory caution against inferring authority from ambiguous appropriations measures, and thus operates like any canon of statutory construction, by supplying helpful, but not controlling guidance in statutory construction.

Banks & Raven-Hansen, *supra*, at 129, 131. Similarly, Professor Ely writes that section 8(a)(1) "gave us [ ] a strong rule of construction, telling us how to read the intent of later congresses," although he further notes that unless the Resolution is repealed, a subsequent congress can only authorize hostilities through an appropriation statute under "extreme circumstances." Ely, *supra*, at 129.[25]

---

[24] The *Great Northern* Court looked solely to the subsequent statute's text to determine whether it conflicted with the prior statute *See* 208 U S at 466–70. As we explain below, under a pure textual analysis, Pub L No. 106–31 evidences a clear intent to authorize hostilities despite section 8(a)(1) In at least one recent case, however, a court looked both to text and legislative history to determine whether a subsequent statute repealed a prior statute *See Passamaquoddy*, 75 F.3d at 790–91 (analyzing Senate Report), *see also Will*, 499 U S at 222 In our view, this approach is more consistent with the current practice of statutory interpretation *See, e g , Murphy Bros , Inc v. Michetti Pipe Stringing, Inc* , 526 U S 344, 351–55 (1999) (analyzing text and legislative history in resolving statutory interpretation question) We explain below why the legislative history also supports our interpretation of Congress's intent in enacting Pub. L. No. 106–31

[25] Although we agree generally with the approach of Banks and Raven-Hansen, we are reluctant to characterize section 8(a)(1) as a "rule of construction " Such a characterization might be read to suggest that the Congress that enacted section 8(a)(1) intended it simply as one measure of how to interpret the intent of subsequent Congresses,

Continued

The determination of whether any particular appropriation statute that does not refer back to the WPR constitutes authorization for continuing hostilities will necessarily depend on the facts of each case. Certain types of evidence will be highly probative of an intent to authorize ongoing military operations. For example, evidence demonstrating that Congress was concerned with funding a specific military effort, as opposed to making general defense appropriations, would tend to show such an intention. Likewise, in a case where the President has requested an appropriation in order to continue military operations, evidence showing that Members of Congress were specifically aware of the purposes of the appropriation request will tend to show that Congress intended to authorize continuing military operations as required by the WPR. Finally, if Congress appropriates funds only for protection of troops already committed or prohibits the use of appropriated funds for the introduction of new troops, a presumption might arise that Congress did not intend to authorize continuing hostilities but instead intended simply to protect troops already on the ground. On the other hand, unlimited appropriations would tend to suggest an intent to authorize continuing hostilities. In short, where Congress, in passing an appropriations bill, clearly intends to authorize conflict, the WPR cannot be read to deny legal effect to that clear intent.

*IV. Pub. L. No. 106–31 and Congressional Authorization of the War in Kosovo*

This section shows that, in passing Pub. L. No. 106–31, Congress clearly intended to authorize continuing military operations in Kosovo. The section begins by providing an overview of the events in Congress leading to the passage of Pub. L. No. 106–31 and of the statute's text. It concludes that, in the absence of the WPR, Pub. L. No. 106–31 would have constituted congressional authorization of military operations in Kosovo. The following three parts look closely at the statute's text and legislative history to determine whether Pub. L. No. 106–31 constituted "specific authorization" under section 5(b)(2) of the WPR. It concludes that the statute constituted such "specific authorization."

*1. Overview*

The "clock" established in section 5(b) of the WPR began running in the present case on March 26, 1999, when the President, citing national security con-

---

a view which seems in tension with the language and purpose of the WPR. We nonetheless agree that, in effect, section 8(a)(1) operates like a rule of construction. Likewise, although we agree with Professor Ely that section 8(a)(1) "tell[s] us how to read the intent of later congresses," we are reluctant to agree with his characterization of the section as "a strong rule of construction " Ely, *supra*, at 129. We also do not agree with Ely that a subsequent Congress can authorize hostilities through appropriations only in "extreme circumstances." *Id* In other words, section 8(a)(1) establishes procedural requirements that a subsequent Congress must follow to authorize hostilities, unless that subsequent Congress decides not to follow those procedures and instead chooses to enact legislation that "expressly or by necessary implication," *Great N Ry.*, 208 U S at 465, authorizes hostilities (A subsequent Congress could, of course, also choose to repeal section 8(a)(1) of the WPR outright )

cerns, informed Congress that U.S. military forces had begun a series of air strikes in the Federal Republic of Yugoslavia. *See* Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro), 1 Pub Papers of William J. Clinton 459 (1999). As the President explained to the Speaker of the House:

> At approximately 1:30 p.m. eastern standard time, on March 24, 1999, U.S. military forces, at my direction and in coalition with our NATO allies, began a series of air strikes in the Federal Republic of Yugoslavia (FRY) in response to the FRY government's continued campaign of violence and repression against the ethnic Albanian population in Kosovo. The mission of the air strikes is to demonstrate the seriousness of NATO's purpose so that the Serbian leaders understand the imperative of reversing course; to deter an even bloodier offensive against innocent civilians in Kosovo; and, if necessary, to seriously damage the Serbian military's capacity to harm the people of Kosovo. In short, if President Milosevic will not make peace, we will limit his ability to make war.

*Id.* The President concluded the letter by informing the Speaker, as is customary, that he was "providing th[e] report as part of [his] efforts to keep the Congress fully informed, consistent with the War Powers Resolution." *Id.* at 460.

Approximately three weeks after sending this letter, the President, through the White House budget office, formally submitted a request to Congress for $6 billion to fund continuing efforts in Kosovo. *See* Guy Gugliotta & Helen Dewar, *$6 Billion Requested for Kosovo Emergency*, The Washington Post, April 20, 1999, at A15. Of this amount, close to $5 billion was to be used for continued air operations and war material through September 30, 1999, and the rest was intended to assist the hundreds of thousands of ethnic Albanian refugees who were fleeing from Kosovo. *Id.* The congressional leadership promptly made clear their intention to use the request as a vehicle to augment defense spending more generally and called for defense funding far in excess of the requested $6 billion. *Id.* (indicating House Majority Leader Richard K. Armey's belief that "[e]ven $10 billion would be insufficient").

Debate over the continuing military operations in Kosovo intensified on April 28, 1999, when the House considered and voted on four different Kosovo-related measures.[26] First, the House defeated two measures introduced by Representative

---

[26] Prior to these measures, the Senate, on March 23, 1999, passed a concurrent resolution providing that "the President of the United States is authorized to conduct military air operations and missile strikes in cooperation with our NATO allies against the Federal Republic of Yugoslavia." 145 Cong Rec. S3118 (daily ed. Mar. 23, 1999) (reprinting S. Con Res 21, 106th Cong (1999)) The following day, the House passed, by a vote of 424–

Continued

Tom Campbell: H. Con. Res. 82, 106th Cong. (1999), a concurrent resolution directing the President to remove the Armed Forces from Serbia within 30 days, and H.J. Res. 44, 106th Cong. (1999), declaring a state of war between the United States and Serbia. *See* 145 Cong. Rec. H2414 (daily ed. Apr. 28, 1999) (reprinting H. Con. Res. 82); *id.* at H2426–27 (recording vote); *id.* at H2427 (reprinting H.J. Res. 44); *id.* at H2440–41 (recording vote). The House also voted 249–180 to support H.R. 1569, 106th Cong. (1999), blocking funding for ground troops without additional specific authorization from Congress, *see* 145 Cong. Rec. H2400 (reprinting measure); *id.* at H2413–14 (recording votes), and tied, 213–213, on S. Con. Res. 21, 106th Cong. (1999), a concurrent resolution stating that the President "is authorized to conduct military air operations and missile strikes" against Serbia. *See id.* at H2441 (reprinting resolution); *id.* at H2451–52 (recording vote). As highlighted by the debates concerning these measures, there can be no doubt that members of Congress were fully cognizant of the WPR and the 60-day time clock.[27]

Despite these votes, the appropriation effort moved forward. Following testimony by Secretary of Defense Cohen before the Subcommittee on Defense on April 21, and after a public markup on April 29, the House Appropriations Committee reported H.R. 1664, 106th Cong. (1999), entitled "[a] bill making emergency supplemental appropriations for military operations, refugee relief, and humanitarian assistance relating to the conflict in Kosovo, and for military operations in Southwest Asia for the fiscal year ending September 30, 1999, and for other purposes," to the full House on May 4. 145 Cong. Rec. H2634 (daily ed. May 4, 1999). The $12.9 billion bill provided the funds requested by the President for military operations in Kosovo, as well as over $6 billion in other military funding, for such things as spare parts, depot maintenance, recruiting, and readiness training. *See* H.R. 1664, ch. 3; *see also* Andrew Taylor, *Paying for the Kosovo Air War: How Much is Too Much?*, CQ Weekly, at 1014 (May 1, 1999). Following a floor debate on May 6, the House passed H.R. 1664 the same day by a vote of 311–105. 145 Cong. Rec. H2895 (daily ed. May 6, 1999).

---

1, a resolution noting the President's authorization of U S. participation in NATO military operations and resolving "[t]hat the House of Representatives supports the members of the United States Armed Forces who are engaged in military operations against the Federal Republic of Yugoslavia " *Id* at H1660, H1668–69 (daily ed. Mar 24, 1999) (reprinting H.R Res. 130, 106th Cong. (1999))

[27] For example, Congressman Spratt pointed out that "[w]ithin 60 days of a deployment, when we are notified by the President, we can enact a specific authorization of such use of the Armed Forces. That was laid out for us when we passed the War Powers Resolution " *Id.* at H2387. Other speakers made similar points *See id* at H2386 (remarks of Cong Chambliss) ("I do not think that now is the time to have a constitutional showdown on the War Powers Act "), *id* at H2389 (remarks of Cong. Stark) (H. Con. Res. 82 "is of the highest priority because we must exercise our obligation under the War Powers Act to debate the use of military force"), *id* at H2423 (remarks of Cong. Leach) ("The vote [we take] on this resolution and the others we will take today are necessitated by . the War Powers Resolution "). Still more pointedly, Congressman Kucinich reminded the House that "Section 5 of the War Powers Resolution states that the President must terminate the use of force after 60 days unless Congress, first, declares war, second, enacts explicit authorization of the use of force; or third, extends the 60-day period " *Id.* at H2446.

The next week, the House and Senate held a joint conference on H.R. 1664 and H.R. 1141, 106th Cong. (1999), another emergency supplemental funding bill that up to that point had focused on providing relief to Central American nations devastated by hurricanes. During the three day conference, the conferees stripped H.R. 1664 of the appropriations relating to Kosovo and other military funding and added those appropriations to H.R. 1141. *See* H.R. Conf. Rep. No. 106–143, at 61 (1999) ("The conferees have agreed to include in this conference report on H.R. 1141 matters addressed in the House version of H.R. 1664 as an expedient approach to getting appropriations enacted into law for the important requirements related to the conflict in Kosovo and Southwest Asia (Operation Desert Fox)."). As the conference report explained, "the conference agreement recommend[ed] a total of $10,196,495,000 in new budget authority for the Department of Defense, for costs resulting from ongoing contingency operations in Southwest Asia and Kosovo, as well as other urgent high priority military readiness matters." *Id.* at 75. Specifically, the conferees agreed to provide $5,007,300,000 "for the 'Overseas Contingency Operations Transfer Fund' for costs relating to Operation Allied Force and related NATO activities concerning Kosovo, and operations in Southwest Asia. Of this amount, $3,907,300,000 is provided for personnel and operations costs stemming from these operations. An additional $1,100,000,000 is provided on a contingent emergency basis to meet expected munitions and readiness-related Kosovo expenses, and will be made available only to the extent funds are requested in a subsequent budget request by the President." *Id.* at 76. The conferees further agreed to appropriate $984,300,000 for munitions procurement "associated with operations in Kosovo and Southwest Asia," *id.*, and $16,469,000 "for additional military personnel pay and allowances in support of contingency operations in Southwest Asia," *id.* They also agreed to appropriate $475,000,000 "to be used for construction of mission, readiness and force protection items in relation to the conflict in the Balkans, and other contingencies throughout the region." *Id.* at 81. Finally, the conferees appropriated over $1 billion for Kosovo humanitarian assistance, including $149,200,000 for "humanitarian food aid in the Balkans and other regions of need," *id.* at 74, $105,000,000 "for assistance for Albania, Macedonia, Bulgaria, Bosnia-Herzegovina, Montenegro, and Romania, and for investigations and related activities in Kosovo and in adjacent entities and countries regarding war crimes," *id.* at 79, and $100,000,000 "for costs related to assisting in the temporary resettlement of displaced Kosovar Albanians," *id.* at 81.

The House debated H.R. 1141 on May 18 and passed the bill by a 269–158 vote on the same day. *See* 145 Cong. Rec. H3269 (daily ed. May 18, 1999). The Senate debated the bill on May 20 and passed it by a 64–36 vote on the same day. *See* 145 Cong. Rec. S5682 (daily ed. May 20, 1999).

The bill signed by the President, entitled "[a]n Act [m]aking emergency supplemental appropriations for the fiscal year ending September 30, 1999, and for other

purposes," appropriated well over $5 billion to fund efforts in Kosovo. The principal provision concerning funding, found in Chapter 3 of Title II of the bill (the Title entitled "Emergency National Security Supplemental Appropriations"), reads as follows:

## OPERATION AND MAINTENANCE
### Overseas Contingency Operations Transfer Fund
#### (Including Transfer of Funds)

> For an additional amount for "Overseas Contingency Operations Transfer Fund", $5,007,300,000, to remain available until expended: *Provided*, That the entire amount made available under this heading is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That of such amount, $1,100,000,000 shall be available only to the extent that the President transmits to the Congress an official budget request for a specific dollar amount . . . .

113 Stat. at 76–77. Another section of Chapter 3 appropriates $300,000,000

> to remain available for obligation until September 30, 2000 . . . only for the accelerated acquisition and deployment of military technologies and systems *needed for the conduct of Operation Allied Force*, or to provide accelerated acquisition and deployment of military technologies and systems as substitute or replacement systems for other United States regional commands which have had assets diverted as a result of Operation Allied Force.

*Id.* at 78 (emphasis added). The other relevant appropriations discussed in the Conference Report are found in various Chapters of Title II of the bill. *See, e.g.*, Chapter 1 (food assistance); Chapter 3 (personnel, procurement); Chapter 4 (humanitarian assistance); Chapter 5 (resettlement); Chapter 6 (construction).[28]
    Finally, section 2006 of the bill provides as follows:

> Sec. 2006. (a) Not more than 30 days after the date of the enactment of this Act, the President shall transmit to Congress a report,

---

[28] For example, Chapter Four of the bill provides "[f]or an additional amount for 'Economic Support Fund,' $105,000,000, to remain available until September 30, 2000, for assistance for Albania, Macedonia, Bosnia-Herzegovina, Bulgaria, Montenegro, and Romania, and for investigations and related activities in Kosovo and in adjacent entities and countries regarding war crimes " 113 Stat. at 84. Chapter Five provides "[f]or an additional amount for 'Refugee and Entrant Assistance,' such sums as necessary to assist in the temporary resettlement of displaced Kosovar Albanians, not to exceed $100,000,000, which shall remain available through September 30, 2001 " *Id* at 85.

in both classified and unclassified form, on current United States participation in Operation Allied Force. The report should include information on the following matters:

(1) a statement of the national security objectives involved in United States participation in Operation Allied Force;

(2) an accounting of all current active duty personnel assigned to support Operation Allied Force and related humanitarian operations around Kosovo to include total number, service component and area of deployment (such accounting should also include total numbers of personnel from other NATO countries participating in the action);

(3) additional planned deployment of active duty units in the European Command area of operations to support Operation Allied Force, between the date of the enactment of this Act and the end of fiscal year 1999;

(4) additional planned Reserve component mobilization, including specific units to be called up between the date of the enactment of this Act and the end of fiscal year 1999, to support Operation Allied Force;

(5) an accounting by the Joint Chiefs of Staff on the transfer of personnel and material from other regional commands to the United States European Command to support Operation Allied Force and related humanitarian operations around Kosovo, and an assessment by the Joint Chiefs of Staff of the impact any such loss of assets has had on the warfighting capabilities and deterrence value of these other commands;

(6) levels of humanitarian aid provided to the displaced Kosovar community from the United States, NATO member nations, and other nations (figures should be provided by country and the type of assistance provided whether financial or in-kind); and

(7) any significant revisions to the total cost estimate for the deployment of United States forces involved in Operation Allied Force through the end of fiscal year 1999.

(b) OPERATION ALLIED FORCE. — In this section, the term "Operation Allied Force" means operations of the North Atlantic Treaty Organization (NATO) conducted against the Federal Republic of Yugoslavia (Serbia and Montengro) during the period beginning on March 24, 1999, and ending on such date as NATO may designate, to resolve the conflict with respect to Kosovo.

113 Stat. at 80.

Pub. L. No. 106–31 specifically appropriated over $5 billion to fund continuing hostilities in Kosovo, but it did not make specific reference to the WPR.[29] The WPR's 60 day clock ran on May 25, four days after the President signed Pub. L. No. 106–31.[30]

As will be shown in greater detail in the following subparts, the congressional debates and the text of Pub. L. No. 106–31 make clear that Congress was unquestionably aware that it was funding the hostilities in Kosovo. Moreover, the appropriations bill was specifically targeted in substantial degree to the President's request for funds to continue the military action in Kosovo. Congress, in other words, used its constitutional authority to appropriate funds to allow the President to continue hostilities in the Federal Republic of Yugoslavia. In light of the nature of the bill and the historical precedent, discussed above, for Congress to authorize hostilities through appropriations measures, Pub. L. No. 106–31 would, in the absence of the WPR, have constituted constitutionally adequate authorization for continued bombing in the region.

## 2. Text

On its face, H.R. 1664 provided authorization, in the form of an appropriations measure, for continuing military operations — or, more specifically, for continuing United States participation in the NATO air campaign — in Kosovo. The bill itself was entitled "[a]n Act Making emergency supplemental appropriations *for military operations,* refugee relief, and humanitarian assistance *relating to the conflict in Kosovo*" (emphasis added). In bearing that title, H.R. 1664 plainly indicated the main purpose for which the appropriated funds would be spent. Although H.R.

---

[29] In this respect, Pub. L No. 106–31 differs from sections 2 and 6 of the Multinational Force in Lebanon Resolution, 97 Stat. at 805, and from section 2(c)(1) of the Authorization for Use of Military Force Against Iraq Resolution, 105 Stat. at 4, both of which referred back to section 5(b) of the WPR *See supra* note 7

[30] Although neither the district court nor the Court of Appeals addressed the merits of the suit brought against the President by 31 Members of Congress, *see supra* p. 328, District Court Judge Friedman did observe in dicta that Pub. L No. 106–31 did not constitute an "authorization" within the meaning of the WPR *See Campbell,* 52 F Supp.2d at 44 n 9 ("While neither the defeat of the House concurrent resolution nor the passage of the Appropriations Act constitutes an 'authorization' within the meaning of the War Powers Resolution, see 50 U S.C. § 1547, congressional action on those measures is relevant to the legislative standing analysis.") For reasons described in this opinion, we conclude that the appropriation did constitute authorization to continue Operation Allied Force, regardless of whether Congress complied with the legislative requirements specified by an earlier Congress in the WPR

1141 did not bear a title explicitly referencing the conflict in Kosovo, its title (indicating that it was a "emergency supplemental appropriatio[n]") as well as its direct connection to H.R. 1664, made it clear that it too was substantially, if not primarily, concerned with funding the ongoing military effort in Kosovo.

Furthermore, particular provisions of the appropriation statute underscore that Congress, in enacting the appropriation, authorized the President to continue military operations in Kosovo for an indeterminate period, but at least to the end of Fiscal Year 1999.[31] For example, section 2006(b) defines the phrase "Operation Allied Force" as the "operations of the North Atlantic Treaty Organization (NATO) conducted against the Federal Republic of Yugoslavia (Serbia and Montenegro) during the period beginning on March 24, 1999, and ending on such date as NATO may designate, to resolve the conflict with respect to Kosovo." 113 Stat. at 80. Moreover, section 2006(a) requires that the President, *"[n]ot more than 30 days after the enactment of this Act,* . . . transmit to Congress a report . . . on current United States participation in Operation Allied Force." *Id.* (emphasis added). The report is to include a statement of national security objectives involved in Operation Allied Force, § 2006(a)(1), as well as information regarding additional planned deployment of certain active duty units to support Allied Force between the date of enactment and the end of fiscal year 1999, § 2006(a)(3), additional planned reserve component mobilization, including specific units to be called up between the date of enactment and the end of fiscal year 1999 to support Allied Force, § 2006(a)(4), and any significant revisions to the total cost estimate for the deployment of U.S. forces involved in Allied Force through the end of fiscal year 1999, § 2006(a)(7).[32]

These reporting requirements make sense only on the assumption that the President was authorized to continue United States participation in Operation Allied Force for at least thirty days after the enactment of Pub. L. No. 106–31, a period that necessarily extended beyond May 25, when the 60 day "clock" had expired. Indeed, the reporting requirements assume that the President could deploy additional active duty units in support of Operation Allied Force, and could mobilize reserves to that end, at various times between the enactment of the bill and *the end of Fiscal Year 1999*—a period that again extended well beyond the 60 day "clock." Finally, section 2006(a)(7) signaled that Congress wished to keep informed of the estimated costs of deploying United States forces in Operation Allied Force through the end of the fiscal year. Taken together, these provisions show that Members of Congress foresaw the possibility that the President would

---

[31] We note that Chapter 3 of Title II, which substantially met the Administration's request for supplemental funding for the Kosovo operation, appropriates $5,007,300,000 "to remain available until expended." 113 Stat at 76 Thus, these funds were to remain legally available for expenditure *even after the end of Fiscal Year 1999. Id* Insofar as Congress authorized the continuation of hostilities by providing these funds, it therefore did not sunset that authorization on September 30, 1999

[32] *Id.* We have been informed that the President submitted this report to Congress on August 19, 1999

continue the deployment after May 25, and that they were prepared to fund contin-
ued military hostilities through at least the end of Fiscal Year 1999.[33]

More generally, Pub. L. No. 106–31 met the President's request for emergency
supplemental funding for the very explicit purpose of continuing military oper-
ations in Serbia and Kosovo. The obvious and stated purpose of the Administration
in seeking this supplemental funding was to meet anticipated expenses of the cam-
paign, including any expenses that would be incurred for operations after May
25. In furnishing such funds, Congress clearly endorsed and authorized the
Administration's plans. Indeed, specific line items in the bill demonstrate
Congress's belief that Operation Allied Force could continue after May 25. For
example, Chapter 3, dealing in part with procurement, appropriated $300 million
"to remain available for obligation until September 30, 2000 . . . only for the
accelerated acquisition and deployment of military technologies and systems
*needed for the conduct of Operation Allied Force*, or to provide accelerated
acquisition and deployment of military technologies and systems as [a] substitute
or replacement systems for other United States regional commands which have
had assets diverted as a result of Operation Allied Force." 113 Stat. 78 (emphasis
added). Again, the funding of "accelerated acquisition and deployment" of mili-
tary technologies "needed for the conduct of Operation Allied Force" unquestion-
ably assumed that that need might exist, and could lawfully be met, after May
25. *Id.*

Furthermore, both H.R. 1141 and H.R. 1664 were plainly identified as *emer-
gency, supplemental* appropriations. Thus, Congress was well aware that the bill
was an extraordinary measure, wholly outside the routine budget process for the
regular funding of Department of Defense activities. This was free-standing and
widely publicized legislation, introduced soon after several major Congressional
debates on the Administration's policy, for the explicit purpose of funding con-
tinuing military operations in Kosovo. Congress decided to fund that operation.

### 3. Legislative History

The legislative history of Pub. L. No. 106–31 strongly confirms this under-
standing of the bill's intent and effect. This part analyzes that history in four
stages: (a) Secretary of Defense William S. Cohen's explanation of the Adminis-
tration's request for emergency supplemental funding made on April 21, 1999,
to the Defense Subcommittee of the House Appropriations Committee; (b) the
House Appropriations Committee's consideration of H.R. 1664; (c) the first House

---

[33] Indeed, the House Appropriations Committee Report states that "[t]he Committee recognizes that the specific
budget estimates underlying the supplemental requests for Kosovo operations may require adjustments due to the
evolving nature of the air campaign, changes in deployment schedules and operational tempo, and other requirements
associated with current operations and currently planned forces which were not identified at the time the supplemental
request was developed." H.R. Rep. No 106–125, at 4 (1999)

floor debate on H.R. 1664 on May 6, 1999; and (d) the final House and Senate votes on H.R. 1141 on May 18 and 20, 1999, respectively.

### a. Secretary Cohen's Testimony

The Administration's statement to Congress of the purposes of seeking the supplemental appropriation weigh heavily in favor of construing Pub. L. No. 106–31 as an authorization to continue Operation Allied Force beyond the May 25 cutoff.[34] Of particular importance is Secretary of Defense William S. Cohen's testimony at an April 21, 1999 hearing by the Subcommittee on Defense of the House Committee on Appropriations, in support of the Administration's request for the supplemental appropriation. *See Department of Defense Appropriations for 2000: Hearings Before the Defense Subcomm. of the House Comm. on Appropriations*, 106th Cong. 288 (1999) (Statement of William S. Cohen, Secretary of Defense). Secretary Cohen made plain the Administration's intent to use the proposed funding to go forward with Operation Allied Force, if necessary for a prolonged period. He stated:

> This is an emergency, non-offset supplemental totaling $6.05 billion: $5.458 billion for DoD and $591 million for the State Department and international assistance programs. The DoD portion of the supplemental has these major components:
>
> Kosovo Military Operations ($3.3 billion). The request funds projected force levels and the current high operating tempo through the end of the fiscal year. All U.S. forces that have been deployed or ordered to deploy are assumed to remain in theater and operate at current sortie and strike levels. The request does not fund possible deployment of U.S. ground forces to Kosovo or peacekeeping operations or reconstruction there.
>
> . . . .
>
> NATO is engaged in a serious military effort in Kosovo. It will not be quick, easy, or neat. We have to be prepared for the possibility of casualties among NATO forces. But we cannot falter, and we will not fail.

*Id.* 291–92.

---

[34] We note also that the President advised Congress that "[i]t is not possible to predict how long either of these operations [air strikes and relief efforts] will continue. The duration of the deployments depend[s] upon the course of events in Kosovo . . . ." Letter for Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro), 1 Pub Papers of William J Clinton 579, 520 (1999)

Secretary Cohen's statements plainly advised Congress of the Administration's determination to pursue military operations, if necessary, for an indefinite period beyond May 25, and he specifically requested Congress to fund such operations at least "through the end of the fiscal year." [35]

### b. House Appropriations Committee Action

Shortly before the House Appropriations Committee considered H.R. 1664 on April 29, Representative William Young, the Chairman of the Committee, stated that "[t]his $12.9 billion bill recognizes that we are more deeply involved in Kosovo than we were led to believe and that unless [President] Milosevic has a major change of heart, our involvement will be deeper than originally anticipated." *Chairman Young Announces Kosovo Emergency Supplemental Bill*, www.house.gov/appropriations/news/106–1/pr00kosovo.html (Apr. 27, 1999). During the mark-up itself, Congressman Young said, "I'm not sure what message [Milosevic] got from that [the House's April 28 votes on authorizing military action], but I can guarantee you when we pass this bill today, there will be no doubt in the mind of Mr. Milosevic where we stand; that this Congress stands behind our troops no matter where they are or what they're doing. And we're going to provide them with what they need to accomplish their mission . . . ." Verbatim Transcript, House of Representatives, Appropriations Committee Markup, 1999 WL 252365 (F.D.C.H.) at 22–23 (Apr. 29, 1999) ("Transcript"). *See also* Tom Raum, *Committee Approves Kosovo Funds*, 1999 WL 17061956 (Apr. 29, 1999); Bill Ghent, *Report on Markup of Draft (Unnumbered): House Appropriations Panel Approves $13 Billion Kosovo Emergency Bill*, LEGI-SLATE Report for the 106th Congress, at 2 (Apr. 29, 1999).[36]

Also during the mark-up, Congressman Obey clearly explained the Administration's purpose in seeking the emergency appropriation, and the length of the operations it was intended to fund. He said:

> Now let me explain what it is we're doing.
>
> In the administration's request for DOD, they asked for $5.5 billion for military operations. To reimburse them for previous costs in Iraq they asked for $272 million, and in Kosovo they asked for

---

[35] *Id* at 291 Further, according to press reports, during the hearing Secretary Cohen "several times described the $6 billion as sufficient to fund through September the operations of an intensified air campaign, to replenish already expended munitions and anticipated munitions needs and to call up and deploy nearly 26,000 reservists " Guy Gugliotta & Bradley Graham, *GOP Sees Opportunity for More Military Money*, The Washington Post, Apr. 22, 1999, at A18.

[36] Other Members of Congress made similar statements before the House floor debate on the bill For example, according to press reports, Congressman David Dreier, the Chairman of the House Rules Committee (which framed the rules for the debate over H R 1664), expressed the view that "President Clinton is acting within his authority and 'Congress cannot hamstring his ability' to win the war." John Godfrey, *Heated Debate Likely on Funding*," The Washington Times, May 6, 1999, at A12

> $3.3 billion. That was meant to finance the salaries, maintenance, operation, the whole shebang, for 500 U.S. aircraft that General Clark initially asked for, for the 82 additional aircraft that he got a month ago, and the 300 more that he's requested which have not yet arrived.
>
> It is meant to finance total saturation bombing of all air space in Yugoslavia 24 hours a day *for the remainder of the fiscal year.* It is a huge operation.

Transcript at 42 (emphasis added).

### c. The House May 6 Floor Debate

The floor debate on H.R. 1664 on May 6 also demonstrates that the House clearly understood that it was funding military operations that could well continue for months after May 25. At the start of that debate, Congressman Obey stated squarely that

> [t]he administration has asked about $6 billion to cover the cost of this war, plus they have asked for humanitarian assistance. The amount that they have requested will pay for an 800-plane war, 24 hours a day bombing of virtually every target in Yugoslavia that one could imagine anywhere. That will be sustained on a daily basis *through the end of the fiscal year.*

145 Cong. Rec. H2827 (daily ed. May 6, 1999) (remarks of Cong. Obey) (emphasis added); *see also id.* at H2856 (remarks of Cong. Obey).

Congressman Young, also speaking at the start of the debate, discounted the April 28 House votes on the Kosovo operation as "votes that gave Members an opportunity to voice their opinion in resolutions that were not truly binding," and argued that the vote on H.R. 1664 "is the real message. This is a message to Milosevic that we are serious. This is a message to our troops that we are serious in providing them with what they need to accomplish their mission and to give themselves a little protection while they are at it." *Id.* at H2828; *see also id.* at H2858 (remarks of Cong. Lewis); *id.* at H2890 (remarks of Cong. Wicker); *but see id.* at H2818 (remarks of Cong. Goss) ("[L]ast week's debate on the War Powers Act showed that Congress was of many minds on the policy issue, but this debate today is not about policy. . . . It is about money."). Speaker Hastert likewise emphasized the need to support troops in action, stating that "[l]ast week, the House spoke on the President's policies concerning the engagement in Kosovo; and, [c]learly, the House had some misgivings about those poli-

cies. But today, let there be no mistake, the United States Congress stands with its soldiers, sailors, and airmen as they defend America." *Id.* at H2822.

Some Members specifically argued that funding was necessary to continue Operation Allied Force. Congressman Dreier maintained that "the price of failure in Kosovo is simply too great at this point. . . . Congress must ensure that the resources are available to carry out that strategy." *Id.* at H2821. Congressman Skelton said that the appropriation "ensures that our military has more than adequate resources to carry out the Kosovo air campaign." *Id.* at H2829. Congressman Knollenberg stated that, while he had "strong reservations about the decisions that have led us to this point," he "believe[d] it is important . . . that NATO continue its operation." *Id.* at H2833. Congressman Gilman interpreted passage of the appropriation as showing that "we are fully supportive of what our military is doing at the present time in Kosovo." *Id.* at H2834 (remarks of Cong. Gilman).

Opponents of the bill also saw it as authorizing continuing operations in Kosovo. Congressman Stark specifically noted that "[a]ppropriating defense funds for the attack on Yugoslavia gives the President the authorization needed under the War Powers Act to continue the air strikes and allow[s] him to use ground troops if necessary. However, if funds were withheld, the President would be required to remove the troops from their current mission by May 25, 1999." *Id.* at H2839. Congressman Paul, another opponent, stated that "[f]unding is an endorsement of the war. We must realize that it is equivalent to it. We have not declared this war. If we fund it, we essentially become partners to this ill-advised war." *Id.* at H2819.

### d. House and Senate Consideration of Final Bill

In addition to the numerous explicit references to the Kosovo conflict contained in the joint conference report described above, the floor debates on the final version of H.R. 1141 also demonstrate that Congress intended to enable the President to continue the campaign for an indefinite period after the WPR's 60 day "clock" had run.

(i)

As he had done in the May 6 debate, Congressman Young again explained to the House the significance of the appropriation for the campaign in Kosovo:

> A no vote will be sending a message to Milosevic that we are not really serious about bringing him to heel. He does not need to get that message, he has got enough problems already. A no vote will be against those soldiers and sailors and airmen and marines and

coastguardsmen who are involved in this conflagration, or war
. . . .

145 Cong. Rec. H3263 (daily ed. May 18, 1999).

Congressman Lewis was no less clear and emphatic:

This bill is committed to funding our effort in Kosovo . . . . As
we move into the months ahead, none of us can predict what the
cost might be. But this bill is a reflection of the fact that the House
wants to make sure that adequate funding is present no matter how
long the war may extend itself. . . .

I must say, Mr. Speaker, one of the messages we are sending here
to our troops that is especially important involves the advanced
funding of pay adjustments for the troops. That essentially tells
them in clear terms that the House is not only supporting their effort
in Kosovo, but intends to continue to support their service for the
country as long as it might continue in the months and the years
ahead.

*Id.* at H3256.

Other speakers stressed the need to fund the NATO mission in Kosovo. Congressman Dreier found the bill "absolutely necessary to offset the very significant costs of the Kosovo campaign. . . . [I]t is now a very clear national interest that both the United States of America and the North Atlantic Treaty Organization alliance prevail in this conflict." *Id.* at H3232–33. Congressman Levin argued that "[t]he House should move quickly to approve the urgently needed funding to continue NATO's military operations against Slobodan Milosevic's forces in Kosovo." *Id.* at H3263. Congressman Bliley said that the bill would "support NATO so that we can bring the conflict in Kosovo to a speedy and successful conclusion." *Id.* at H3267.

As in the May 6 debate, other House members emphasized the need to support troops in combat. Congressman Regula stated that "the purpose of this bill is to support our troops overseas." *Id.* at H3257. Congressman Packard said that "H.R. 1141 supports America's troops, and regardless of whether you agree with the policies of this Administration, we can't afford to neglect the needs of those who must carry them out." *Id.* at H3259. Congressman Weygand voted for the bill "because I believe it is absolutely necessary to provide our troops with the tools and support they need to complete their mission." *Id.* at H3264.

Opponents of the bill also repeated their warnings that the bill would allow the continuation of hostilities. Congressman Kucinich thought that the bill "contains provisions that will enable the prosecution of a wide war against the Federal

Republic of Yugoslavia, even though Congress has expressly voted not to declare war." *Id.* at H3226. Congressman Paul said, "the real principle here today that we are voting on is whether or not we are going to fund an illegal, unconstitutional war. It does not follow the rules of our Constitution. It does not follow the rules of the United Nations Treaty. It does not follow the NATO Treaty. And here we are just permitting it, endorsing it but further funding it." *Id.* at H3228.

(ii)

The Senate debated H.R. 1141 two days after the House vote. The Senate's consideration of the Kosovo appropriation was much less extensive than the House's. As Senator Byrd observed on May 20, 1999 — the day H.R. 1141 was debated and voted on in the Senate — "[T]he first time the Kosovo funding has been before the Senate is today in the form of this conference agreement on H.R. 1141." 145 Cong. Rec. S5646 (daily ed. May 20, 1999).[37]

Although most of the speakers in the Senate debate focused on other aspects of the bill, an opponent, Senator Fitzgerald, spelled out very precisely the effect that passage of the appropriation would have on the issue of war powers:

> [I]n the past, American presidents have argued that a congressional appropriation for U.S. military action abroad constitutes a congressional authorization for the military action. I will not vote for an authorization of money that may be construed as authorizing, or encouraging the expansion of, the President's military operations in Kosovo. I will oppose the appropriation of almost $11 billion for a war I have consistently spoken out against.

145 Cong. Rec. S5665 (daily ed. May 20, 1999).[38]

---

[37] The Senate was aware, well before the floor debate on H R. 1141, of the effect of the WPR on its deliberations over Kosovo. Earlier in the session, Senator McCain had introduced a measure, S.J. Res 20, to authorize the President to use "all necessary force" to achieve the goals of Operation Allied Force. *Id* at 2. Although the Senate had at first seemed unlikely to take up that measure, "Senate Parliamentarian Bob Dove announced April 28 .  that the resolution fit the criteria for triggering the War Powers Resolution, even though it was not designed with that in mind." Pat Towell, *Congress Set To Provide Money, But No Guidance, for Kosovo Mission, C.Q. Weekly,* May 1, 1999, at 1037. When the Senate debated S.J. Res 20 on May 3, 1999, Senator Feingold drew attention to the fact that the measure "has been determined to be privileged under the terms of  . . the War Powers Resolution," and emphasized that "[n]ot only must [the WPR] be taken seriously, but because of the appropriate ruling of the Parliamentarian . . , it is being taken seriously." 145 Cong. Rec S4525 (daily ed May 3, 1999) (remarks of Sen Feingold). Further, he added that before the Parliamentarian's ruling, "many people did not realize for a while, that the War Powers Resolution and its clock were ticking " *Id* S J. Res. 20 was tabled by the Senate by a 78–22 vote on May 4, 1999. 145 Cong. Rec. S4616 (daily ed May 4, 1999) Later, the Senate passed a concurrent resolution authorizing the President to conduct military air operations and missile strikes in cooperation with our NATO allies against the Federal Republic of Yugoslavia. *See supra note 26 .*

[38] Senator Gorton, another opponent of the bill, also objected that it would "pay for the costs of the war in the Balkans." *Id.* at S5650

Speaking immediately after Senator Fitzgerald, Senator Dodd, a supporter of the bill, explained that the appropriation would indeed support the continuation of military action:

> The original intent of the President's request for emergency appropriations from Congress was to provide our men and women in uniform with the equipment and materiel they need to effectively strike the Yugoslav military. While I am heartened by recent reports of a possible diplomatic solution, we must remain prepared to continue our military efforts in the absence of an enforceable diplomatic solution which meets NATO's conditions.
>
> . . . .
>
> Our military, however, cannot effectively combat this evil if we in the Congress fail to offer them our support. One month ago, President Clinton sent a request to Congress for $6 billion in order to fund our military operations *through the end of the fiscal year.* That money is included in this bill.

*Id.* at S5666 (emphasis added).

Senator Stevens, the Chairman of the Senate Appropriations Committee, asserted that the funding was intended to provide for military operations in Kosovo through the remainder of the *calendar* (not merely fiscal) year:

> Hopefully we will not have to see another emergency supplemental with regard to the conduct of the Kosovo operation during the period of time we will be working on the regular appropriations bills for the year 2000. In effect, we have reached across and gone in — probably this bill should be able to carry us, at the very least to the end of this current calendar year. The initial requests of the President took us to the end of the fiscal year on September 30.

*Id.* at S5644.

As in the House debate, several speakers voiced the need to support troops in ongoing combat. For example, Senator Warner said, "I support this bill for one simple reason — we are at war. As we speak, we have military forces engaged in combat — going in harm's way — in the skies over the Balkans and Iraq. Whether or not there is agreement on how these risk-taking operations are being prosecuted is not now the question. We must support our military forces who are risking their lives daily to carry out the missions they have been assigned." *Id.* at S5661. *See also id.* at S5650–51 (remarks of Sen. Hutchison); *id.* at S5656–57 (remarks of Sen. Domenici); *id.* at S5662–63 (remarks of Sen. Durbin); *id.* at S5664–65 (remarks of Sen. Harkin).

## V. Pub. L. No. 106–31 and the War Powers Resolution

As described in the preceding section, the text of Pub. L. No. 106–31 and the legislative record as a whole make clear that Congress intended, by enacting the President's request, to enable the President to continue U.S. participation in Operation Allied Force for as long as funding remained available, *i.e.*, through at least the end of the fiscal year on September 30, and indeed even longer.[39] Congress was repeatedly advised of this effect by its own Members (both supporters and opponents of continuing the operation) and by Administration witnesses. For at least the month that the Administration's request was pending, and at a time when the duration of hostilities was uncertain, Congress was aware that a vote for the bill would be a vote to authorize the campaign.[40]

In this context, the concerns that have been voiced about finding congressional authorization in general appropriation statutes are not applicable. The purposes of both H.R. 1664 and H.R. 1141 were plain on the face of the bills. Nor was this a case in which the Committees with jurisdiction over war powers "would [have been] somewhat surprised to learn that their careful work on the substantive legislation had been undone by the simple- and brief-insertion of some inconsistent language in Appropriations Committees' Reports." *Hill*, 437 U.S. at 191 (rejecting Authority's argument that a series of appropriations funding the Tellico Dam Project constituted an implied repeal of the Endangered Species Act). In this case, "Congress as a whole was aware of" the basic terms of the special, emergency appropriation for continuing military operations in Kosovo. *Id.* at 192. The bill was surely among the most visible and important pieces of legislation introduced

---

[39] As noted above, the core appropriation of some $5 billion was "available until expended." 113 Stat at 76–77 In other words, it was a "no-year" appropriation that remained legally available even after September 30.

[40] In reaching this conclusion, we need not and do not decide that the appropriation authorized the introduction of United States Forces onto the ground in Serbia or Kosovo Interpretation of Pub. L No 106–31 must take into account the House of Representatives' vote on April 28 to block funding for ground troops without additional specific authorization from Congress, the President's Letter to the Speaker of the House of Representatives of April 28, 1999, agreeing not to deploy ground troops in a "non-permissive environment" without first "ask[ing] for Congressional support,"*see* 145 Cong Rec. H2883 (daily ed. May 6, 1999) (reprinting letter); *see also* 145 Cong. Rec. H2405 (daily ed Apr. 28, 1999) (remarks of Cong Gephardt, explaining President's representations), 145 Cong Rec S4531 (daily ed. May 3, 1999) (reprinting similar letter of April 28, 1999, to Senate Majority Leader); Chairman Young's statement that "[t]here is nothing in [H.R 1664] that would authorize any money to be used to deploy ground troops into Kosovo," 145 Cong. Rec H2882 (daily ed. May 6, 1999); Congressman Lewis's statement during the House Appropriations Committee's mark-up that "not a dime of these funds will be spent for troops being placed in Kosovo," Transcript at 10; and Secretary Cohen's statement of April 21 that the supplemental appropriation will not fund the introduction of ground troops to Kosovo. Moreover, on May 25, 1999, Senator Warner, speaking in opposition to a proposed rider to S. 1059, 106th Cong (1999), the Department of Defense authorization bill for Fiscal Year 2000 that would have required Congressional authorization before United States ground troops could be deployed in Yugoslavia, stated that, on that day, the Secretaries of State and Defense and the National Security Adviser, in a meeting with Senators, had "said without any equivocation whatsoever that the President would formally come to the Congress and seek legislation" before deploying ground troops 145 Cong. Rec. S5939 (daily ed May 25, 1999) In light of those actions and statements, which of course were closely contemporaneous with Congressional consideration of H.R. 1664 and H.R. 1141, it is unlikely that Congress intended to provide authorization for the introduction of ground troops into Serbia or Kosovo by enacting this appropriation. We note, however, that the House voted on May 6 to reject an amendment, proposed by Congressman Istook, to ban the use of the supplemental appropriation to fund the deployment of ground troops into Yugoslavia, "except in time of war." 145 Cong. Rec H2879, H2891–92 (daily ed. May 6, 1999).

before the first session of the 106th Congress, and both the Administration and individual members pointedly and publicly underscored its significance. Finally, unlike, for example, the Tellico Dam appropriations involved in *Hill*, which "represented relatively minor components of the lump-sum amounts" of the Authority's entire budget, H.R. 1141 was a freestanding bill that, in the form in which it was presented by the Administration, focused narrowly on military spending for Operation Allied Force. *Id.* at 189.[41] In sum, H.R. 1141 was intended to enable the President to continue Operation Allied Force, and to furnish him with the necessary funds for doing so, even if that operation were not brought to a successful conclusion by May 25. Pub. L. No. 106–31 is thus analytically similar to earlier congressional appropriation statutes, discussed in Section II, that authorized executive branch action (including the statutes that played a role in authorizing conflict).

The House's votes on the four other Kosovo-related measures on April 28 do not lead us to change our conclusion. *See supra* pp. 348–49. Although the House did defeat the resolution declaring a state of war between the United States and Serbia and passed a resolution blocking funding for ground troops without additional specific authorization, it also defeated a resolution that would have directed the President to remove the Armed Forces from the region and tied on the resolution that would have specifically authorized the President to conduct military air operations against Serbia. The message of all these votes is ambiguous. The only clear message that Congress sent regarding the continuation of military operations in Serbia is Pub. L. No. 106–31, which appropriated over $5 billion to continue these operations. As we have already explained, this was sufficient to constitute specific authorization within the meaning of the WPR.

Moreover, the argument, explained earlier, see *supra* p. 338–39, and invoked by Judge Randolph in his concurrence in *Campbell,*[42] that appropriation statutes should not be understood as authorizing hostilities because they might just as easily be intended to protect troops already committed, carries little weight here. We recognize that a number of statements made by Members of Congress (*e.g.*, Senator Warner, Congressman Weygand) indicate an intention to "support" already committed troops. These isolated statements, however, do not demonstrate that Congress did not intend to authorize continuing hostilities. The United States did not have ground troops in combat in Serbia or Kosovo at the time Pub. L. No. 106–31 was enacted, but rather was engaged in an air campaign in which U.S. forces were in harm's way only for the length of each sortie flown. If Con-

---

[41] Although Pub L. No 106–31 of course ended up making a range of appropriations in addition to those for the Kosovo effort, the legislative history makes clear that the bill's central, overriding purpose was to fund the hostilities in Yugoslavia.

[42] *See Campbell*, 203 F 3d at 31 n.10 (Randolph, J , concurring) ("The majority attaches some importance to Congress's decision to authorize funding for Operation Allied Force and argues that Congress could have denied funding if it wished to end the war However, in *Mitchell v Laird* we held that, as 'every schoolboy knows,' Congress may pass such legislation, not because it is in favor of continuing the hostilities, but because it does not want to endanger soldiers in the field The War Powers Resolution itself makes the same point ")

gress did not intend to authorize continuing hostilities, but instead intended only to protect previously deployed troops, it could have, and most likely would have, styled its rejection of authorization for continuing hostilities by either phasing out appropriated funds over time, as it did in the case of Somalia, or by prohibiting the use of funds for certain purposes, as it did with the Cooper-Church amendment. Here, Congress chose neither option. Instead, it appropriated funds "until expended" without placing any limitations on the use of those funds. The actual steps taken by Congress demonstrate that it intended to authorize the President to continue hostilities, and, in particular, to continue the air campaign. *See Berk*, 317 F. Supp. at 724 (noting that even though some Members of Congress stated that "their votes for the appropriation did not constitute approval of an undeclared war [in Vietnam]," nonetheless the appropriation "gave Congressional approval to military expenditures in Southeast Asia"); *id.* at 728 (finding that the "disclaimers by individual Congressmen of any approval of the Vietnam conflict" could only " 'disclose the motive and could not disprove the fact of authorization' " (citation omitted)). In light of Congress's possible alternatives, reading the statements at issue as indicating an intent to protect already deployed troops simply "doesn't make sense." Ely, *supra*, at 129. It is more reasonable to interpret those statements as indicating an intent to "support" American troops by authorizing the President to continue hostilities so those troops would be able to complete their missions successfully.

Section 8(a)(1) does not lead to a contrary conclusion. As discussed above, that section cannot constitutionally be read to take from Congress a mechanism for authorizing war permitted by the Constitution. Instead, it has the effect of establishing a background principle against which Congress legislates. Section 8(a)(1) means, then, that it cannot be "inferred" — to quote the language of the provision — that Congress has authorized the continuation of conflicts from the mere fact that it has enacted an appropriation statute (unless the statute references the WPR). Nonetheless, if the text and legislative history of the appropriation statute make clear that it was Congress's clear intent to authorize continued operations, that intent is controlling, even if the statute does not reference the WPR. Such an appropriation statute is an implied partial repeal of section 8(a)(1) (or a supersession of section 8(a)(1)). For reasons already discussed, Pub. L. No. 106–31 is such a statute.[43]

Finally, it is worth observing that, in this case, the underlying purpose of the WPR's "clock" was fully satisfied. That clock functions to ensure that, where the President commits U.S. troops to hostilities without first obtaining congres-

---

[43] For all the reasons discussed in this opinion, the maxim discussed above-that the law disfavors implied repeals, *see supra note 22* — does not apply. This is not a case, for example, in which a Member of Congress would have had to "scrutiniz[e] in detail the [Appropriation] Committee proceedings" to become aware of the discrepancy between section 8(a)(1) and Pub. L. No 106–31. *Tennessee Valley Authority*, 437 U S at 189 n.35. Indeed, because Pub L No 106–31 was among the most prominent pieces of legislation pending before the 106th Congress, and because both the Administration and individual Members of Congress strongly and visibly underscored the significance of the legislation, "Congress as a whole was aware of" the basic terms of Pub. L No 106–31 *Id* at 192

sional authorization, Congress has the opportunity to consider the merits of the President's actions and to decide whether those hostilities may continue. Here, the President ordered a series of air strikes in the Federal Republic of Yugoslavia "to demonstrate the seriousness of NATO's purpose so that the Serbian leaders understand the imperative of reversing course; to deter an even bloodier offensive against innocent civilians in Kosovo; and, if necessary, to seriously damage the Serbian military's capacity to harm the people of Kosovo." Letter for the Speaker from the President, 1 Pub. Papers of William J. Clinton at 959. Congress then had the opportunity to deliberate on the wisdom of the President's actions, which it did, considering several resolutions relating to the military efforts in Kosovo. After all of those deliberations, Congress decided to use one of its most important constitutional powers over war and peace — its appropriation power-specifically to fund the ongoing military effort. By doing so, it authorized the President to continue military activities in the region.

## Conclusion

Pub. L. No. 106–31 constituted Congressional authorization for continuing bombing efforts in Kosovo even after the running of the 60 day clock established by section 5(b) of the WPR. Interpreted in light of constitutional concerns, section 8(a)(1) of the WPR does not lead to an alternative result; properly read, section 8(a)(1) simply has the effect of establishing a background principle against which subsequent Congresses legislate when they enact appropriation statutes. Section 8(a)(1) creates procedural requirements that subsequent Congresses must follow to authorize hostilities. If a subsequent Congress, however, chooses in a particular instance to enact legislation that either expressly or by clear implication authorizes hostilities, it may decide not to follow the WPR's procedural requirements. In this case, read in light of the background principle established by section 8(a)(1), the text and legislative history of Pub. L. No. 106–31 make clear that Congress intended to authorize continuing hostilities in the Federal Republic of Yugoslavia.

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*